TEMPLE UNIVERSITY—OF the COMMONWEALTH SYSTEM OF HIGHER EDUCATION

v.

The ASSOCIATED HOSPITAL SERVICE OF PHILADELPHIA, Trading as Blue Cross of Greater Philadelphia, et al.

Civ. A. No. 71–3119.

United States District Court, E. D. Pennsylvania.

June 28, 1973.

Leonard C. Homer, Peter Platten, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for plaintiff.

Richard P. Brown, Jr., James Sommar, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION AND ORDER

VanARTSDALEN, District Judge.

Plaintiff, Temple University (Temple) through the Temple University Hospital is a provider of "medi-care" services pursuant to 42 U.S.C. §§ 1395 and 1395x(u). As such, Temple is entitled to certain reimbursements from the government through the Deprtment of Health, Education and Welfare (HEW), including a portion of its general operating costs based upon a complicated formula calculated in part on the ratio of "medi-care" patients to total patients served during an accounting period. In determining the operating costs for purposes of reimbursement, "restricted" gifts received by a hospital during an accounting period are deducted from total operating costs, whereas "unrestricted" gifts are not deducted. This is in accordance with HEW Regulation, 20 C.F.R. 405.423. The validity of this regulation is not presently in dispute. The effect of a "restricted" gift is to reduce the amount of reimbursement to a hospital.

During the years 1967, 1968 and 1969, Temple transferred on its books approximately $600,000 annually from its Medical School to its Hospital, which transfers it contends were unrestricted and thus not deductible. In 1966, Temple selected the defendant, Blue Cross Association, as its intermediary pursuant to 42 U.S.C. § 1395h and 20 C.F.R. 405.651. The Blue Cross Association (BCA) in turn appointed the defendnt, The Associated Hospital Service of Philadelphia, trading as Blue Cross of Greater Philadelphia (Phila. Blue Cross), as its agent to perform the intermediary services within the geographical area wherein Temple is located. The defendants contend that by proper procedures the transfers of funds have been finally determined to be "restricted," which determination cannot be challenged in this court.

All parties have moved for summary judgment. Plaintiff seeks to invalidate the determination that the transfers were restricted. Plaintiff asserts that the review procedures for determining provider-intermediary disputes are inherently biased and represent an unconstitutional delegation of a quasi-judicial function to a private organization, thereby violating procedural due process. Plaintiff further contends that this court should review and hold a *de novo* hearing to redetermine the issues on the merits. Defendants contend that although this court may determine the "constitutional" issues, it lacks jurisdiction to decide the merits of the issues, and that the procedures utilized were entirely valid, final and not subject to review.

42 U.S.C. § 1395h provides that "if any group or association of providers of

services wishes to have payments" made through a private agency or organization, "and nominates such agency or organization for such purpose," the government is authorized to enter into an agreement with such agency or organization "providing for the determination by such agency or organization (subject to such review by the Secretary as may be provided for by the agreement) of the amount of payments required . . . and for making such payments . . . to such providers." Such a private agency or organization is designated as a fiscal intermediary. The individual providers of services, such as Temple, then have the option of dealing through the fiscal intermediary or directly with the government. Appointment of the fiscal intermediary may be withdrawn by an individual provider.[1] 20 C.F.R. 405.651 (c) states in part that "the fiscal intermediaries act on behalf of the Secretary, carrying on for him the administrative responsibilities imposed by the law. The Secretary, however, is the real party in interest in the administration of the program. . . ."

BCA entered into an agreement with the government to perform services as a fiscal intermediary,[2] and was selected by Temple in 1966 as its fiscal intermediary. BCA delegated its duties to Phila. Blue Cross,[3] and Temple dealt with Phila. Blue Cross.

The Health Insurance for the Aged Act, commonly referred to as the Medicare Act, 42 U.S.C. § 1395 et seq., at the time of the dispute contained no express provisions for appeal or review of disputes between the intermediary and the provider as to the amounts or methods of calculating reimbursements. Two years after Temple selected BCA as its intermediary, BCA established the "Blue Cross Association Medicare Provider Appeals Committee" (Appeals Committee) to review intermediary-provider disputes. The Appeals Committee was to be composed of five members. Three members were to be from the BCA (at least one of such three members had to be a BCA Vice-President). Two members were to be from a national hospital association approved by the provider, but individually selected by the BCA President who made all the appointments to the Appeals Committee.

Phila. Blue Cross determined that the annual transfers of $600,000 in 1967, 1968 and 1969 were restricted gifts and should offset reimbursable Medicare expenses thus substantially reducing the money which would be reimbursed to Temple. On November 30, 1970, Temple appealed the decision to the Appeals Committee claiming that the transfers were unrestricted contributions to the hospital and should not be deducted from Medicare expenses under HEW regulations. A hearing was held on March 31, 1971 attended by representatives and attorneys from Temple and Phila. Blue Cross. Witnesses were called and were subject to direct and cross-examinations. On August 2, 1971, the Appeals Committee notified Temple that Phila. Blue Cross's decision had been upheld.

Temple posits its case upon three fundamental arguments. It first asserts that the inherent composition of the Appeals Committee is biased and unfair and, therefore, violates due process as a matter of law. Bias and prejudice are allegedly present because: (1) BCA, a national membership organization consisting of an association of approximately eighty Blue Cross Plans (includng Phila. Blue Cross), receives 56 percent of its total income from monthly dues and marketing service charges from the individual association plans; (2) BCA has been receiving increasing amounts of income from Phila. Blue Cross which rose from $18,578.48 in 1966 to $212,311.36 in 1971; (3) the

---

1. 42 U.S.C. § 1395h(d) ; 20 C.F.R. § 405.-651(a).

2. Plaintiff's Exhibit B attached to complaint.

3. Plaintiff's Exhibit C attached to complaint.

Appeals Committee is composed of a majority of BCA members; (4) the requirement of a BCA Vice-President on the Committee infuses "command influence" into the Appeals Committee and discourages independent actions by the other BCA members. In short, Temple contends that the agential and economic relationship between BCA and Phila. Blue Cross vitiates a fair and impartial review by the Appeals Committee.

Secondly, Temple directs a two-pronged attack on the authority of the BCA to review provider-fiscal intermediary disputes. It contends that there is no statutory provision in the Medicare Act or Social Security Act authorizing the Secretary of Health, Education, and Welfare to delegate this review power. Even if such authority exists, Temple contends that such review power is quasi-judicial and cannot validly be granted to a private organization.

Finally, Temple argues that the court should assume jurisdiction on the merits and conduct a *de novo* hearing and review of record and decide the merits of the case.

■ Plaintiff's contention that the Appeals Committee is inherently biased presents a substantial constitutional question in light of the decisions in Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973), and Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). Although at least one district court has heretofore decided that the delegation of quasi-judicial power by the Secretary of HEW to a private organization is val-

id,[4] this also presents a substantial question. Before deciding these issues, however, it is appropriate to determine the right and scope of review by this court, if any, of the decision of the Appeals Committee.

Defendants concede that the district court has the right to determine any issues involving constitutional questions including lack of due process in the review procedures, but they insist there is no right to review the merits of the controversy concerning whether the transfers were "restricted" or "unrestricted gifts."

The only express provisions for judicial review of determinations by the Secretary of HEW under the Medicare Act are contained in Section 1869, 42 U.S.C. § 1395ff. This section permits judicial review in accordance with procedures set forth under Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), in three types of situations. The first concerns individual claimants to benefits of $1,000 or more under Parts A or B of the Medicare Act.[5] The second involves the right to judicial review of a determination that an institution is not a provider; *i. e.*, not eligible to receive payments as a provider of services. The final express right of judicial review concerns disputes over termination of an institution's status as a provider.[6] The procedures for agency hearing and judicial review are the same as under the Social Security Act; 42 U.S.C. § 405(g) provides, *inter alia*:

The findings of the Secretary as to any fact, if supported by substantial

---

4. In Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins. Co., 311 F.Supp. 405 (E.D.Wis.1970), the court discussed this issue in light of the provider's choice of dealing with either a fiscal intermediary or the government. The court stated at 411:

   I also reject the plaintiffs' contention that the delegation of authority to Mutual, a private organization, is improper. Section 1395h permits a provider of services to deal directly with the Secretary of Health, Education, and Welfare. See 20 C.F.R. §§ 405.401, 405.651, 405.654–.656 The plaintiffs

   cannot be heard to complain about their own choice. Furthermore, I do not find that such delegation is unreasonable.

5. In general Part A benefits accrue to an individual for specified hospital and hospital related care, while Part B supplemental benefits accrue for specified medical care and treatment generally unassociated with hospital care. See 42 U.S.C. 1395d for Part A coverage and 42 U.S.C. 1395k for Part B coverage.

6. 42 U.S.C. § 1395cc(b)(2).

evidence, shall be conclusive, and where a claim has been denied by the Secretary or a decision is rendered under subsection (b) of this section which is adverse to an individual who was a party to the hearing before the Secretary, because of failure of the claimant or such individual to submit proof in conformity with any regulation prescribed under subsection (a) of this section, the court shall review only the question of conformity with such regulations and the validity of such regulations.

Section 205(h) of the Social Security Act, 42 U.S.C. § 405(h) [7] provides:

The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or .decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. . . .

Thus defendants argue that the statute expressly prohibits all judicial review except for the limited situations expressly provided in Section 1869, none of which would be applicable to the present dispute. Section 1869 makes no provision for review of a dispute between the provider and fiscal intermediary, acting on behalf of the Secretary of HEW, as to the amount and method of computing the compensation to be paid the provider. Defendants further contend that the legislative history of the Medicare Act tends to support their position that there is no right of judicial review on the merits.[8]

■ There is a strong presumption in favor of reviewability of agency action by the courts. "Judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress." (citations omitted). Abbott Laboratories v. Gardner, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967). The Administrative Procedure Act, 5 U.S.C. § 701 et seq., has reinforced this presumption. The "generous review provisions" of the Administrative Procedure Act have been repeatedly mandated by the Supreme Court to be given a "hospitable" interpretation. Abbott Laboratories v. Gardner, *supra*, at 141, 87 S.Ct. 1507. Only upon "clear and convincing evidence" of a contrary legislative intent should courts restrict access to judicial review. Rusk v. Cort, 369 U.S. 367, 379–380, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962). *See also*, Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The mere fact that some acts are expressly made reviewable by statute should not suffice to support an implica-

---

7. Made a part of and incorporated into the Medicare Act by 42 U.S.C. § 1395ii.

8. The committee's bill provides for the Secretary to make determinations, under both the hospital insurance plan and the supplementary plan, as to whether individuals are entitled to hospital insurance benefits or supplementary medical insurance benefits and for hearings by the Secretary and judicial review where an individual is dissatisfied with the Secretary's determination. Hearings and judicial review are also provided for where an individual is dissatisfied with a determination as to the amount of benefits under the hospital insurance plan if the amount in controversy is $1,000 or more. (Under the supplementary plan, carriers, not the Secretary, would review beneficiary complaints regarding the amount of benefits, and the bill does not provide for judicial review of a determination concerning the amount of benefits under part B where claims will probably be for substantially smaller amounts than under part A.) *Hospitals, extended care facilities, and home health agencies would be entitled to hearing and judicial review if they are dissatisfied with the Secretary's determination regarding their eligibility to participate in the program. It is intended that the remedies provided by these review procedures shall be exclusive.* (Emphasis supplied by defendants).

S.Rept. 404 (Social Security Amendments of 1965), 89th Cong., 1st Sess. 54–55, 1 U.S.Code Cong. & Admin.News, p. 1995 (1965).

tion of exclusion as to other acts. Jaffe, Judicial Control of Administrative Action, 357 (1965). (Cited with approval in Abbott Laboratories v. Gardner, *supra*).

In Aquavella v. Richardson, 437 F.2d 397 (2d Cir. 1971), the denial of review by the district court of a decision of the Secretary of HEW to suspend payments to a provider under the Medicare Act asserted to be without statutory authority and in violation of the Constitution was reversed.

In reviewing § 405(h), the *Aquavella* Court pointed out that this identical section had previously been considered by the Second Circuit in Cappadora v. Celebrezze, 356 F.2d 1 (2d Cir. 1966). *Cappadora* involved judicial review of an individual claim for benefits under the Social Security Act. The *Cappadora* Court held that the Court had jurisdiction and that the restrictive language of the second sentence of § 405(h) referred only to those situations in which review was expressly provided in the Social Security Act:

> Although it could be argued that the second sentence of § 405(h) . . . is a statutory preclusion of such review, the more reasonable construction is that this simply forbids attempts to review final decisions on the merits by any route other than that provided in § 405(g).

*Id.* at 5. The *Aquavella* Court adopted the foregoing reasoning with respect to the review provisions of the Medicare Act.

> Where the Medicare Act establishes procedures for review of the Secretary's decision, a court may not review that decision by any other means. However, where the Act does not provide such procedures, section 405(h) does not preclude review.

*Aquavella, supra,* 437 F.2d at 402.

The defendant in *Aquavella,* like the defendants in the instant case, contended that the Medicare Act expressly and impliedly precluded judicial review of provider-fiscal intermediary disputes other than provider qualification and termination controversies. In support of its position, the *Aquavella* defendant cited the identical statutory language and legislative history that is being cited in the instant case. After a thorough examination of the statutory authority, the *Aquavella* Court held that there was no clear and convincing language in the Medicare Act precluding judicial review. The Court further found Congressional intent to preclude judicial review to be lacking in Senate Report No. 404, the legislative history. Indeed, the *Aquavella* Court found that the legislative history reinforced the *Cappadora* conclusion that the restrictive language of § 405(h) only applied to those cases where statutory review was expressly designated. *Id.*

Coral Gables Convalescent Home, Inc. v. Richardson, 340 F.Supp. 646 (S.D. Fla.1972), held that denying a provider of services a review hearing following a decision by a fiscal intermediary to reduce the amount of reimbursable costs violated due process.[9] Although not directly on point, certain passages from the *Coral Gables* decision are instructive. The court stated at 650:

> This court, like the Second Circuit in Aquavella v. Richardson, 437 F.2d 397 (2d Cir. 1971), is disconcerted by defendants' contention that plaintiff is entitled to neither administrative nor judicial review of the Aetna determination. Such a position is unjustified under the Medicare Act, which neither requires nor proscribes a hearing in the situation at issue.

Kingsbrook Jewish Medical Center v. Richardson, 355 F.Supp. 965 (E.D.N.Y.1973), held that despite *Aquavella* (from its own Circuit), the final determination by the Secretary of HEW as to the method of computing reimbursable costs for a provider of services was not

---

9. Following this case, regulations were promulgated providing for review hearings. See 20 C.F.R. §§ 405.490–405.499(b).

reviewable. The court found that congressional intent to preclude judicial review of the Secretary's determination regarding reimbursable costs was "clear and convincing." I disagree with that conclusion, as applied to the facts of this case. I recognize that the *Aquavella* Court did not consider the right of review of overpayment or reimbursement decisions made by the Secretary of HEW. However, the statutory examinations of *Aquavella* appear applicable to a review of reimbursement disputes and strongly indicate that nothing in the Medicare Act or its legislative history precludes judicial review of the merits of the present controversy. Following the logic of *Aquavella,* the present controversy would appear to be subject to judicial review.

HEW regulations provide that an "unrestricted" gift is not deductible for computing reimbursable costs whereas a "restricted" gift is. I conclude that a final agency determination, through its Appeals Committee procedure, that receipt of funds by a hospital constitutes a restricted gift under 20 C.F.R. 405.423, is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 701 et seq.[10]

■ Having determined that there is a right of judicial review, the scope of review and standards to be applied must be ascertained. Since the right of review is based upon the Administrative Procedure Act, the scope of review will likewise be controlled by that Act. 5 U.S.C. § 706. Plaintiff seeks a full *de novo* hearing and review of the record before the Appeals Committee, including the court making its own findings of fact and conclusions of law. Although there is authority for a full *de novo* review, including presentation of new evidence, in instances where there is no statutory requirement for any agency hearing,[11] the Third Circuit Court of Appeals, following the Sixth Circuit's opinion of Warren Bank v. Camp, 396 F.2d 52 (6th Cir. 1968), held in Ramapo Bank v. Camp, 425 F.2d 333 (3rd Cir. 1970), that a *de novo* hearing is not required in such a situation. I deem a *de novo* hearing and/or a *de novo* review of the case to be inappropriate.

There appears to be some uncertainty as to when, in reviewing agency action pursuant to the Administrative Procedure Act, the "substantial evidence" test is to be applied and when the "arbitrary and capricious" test is to be applied. For an analysis of the problem see Charlton v. United States, 412 F.2d 390 (3rd Cir. 1969), including both the opinion of Judge Kalodner and the concurring opinion of Judge Stahl. For purposes of this decision, I find it necessary only to review under the more stringent requirements of the "arbitrary and capricious" test.

■■ "Arbitrary" action has generally been defined as action taken "without any rational basis." Carlisle Paper Box Co. v. N.L.R.B., 398 F.2d 1 (3rd Cir. 1968); Eastern Central Motor Carriers Ass'n v. United States, 239 F.Supp. 591 (D.D.C.1965). It should be noted that although many cases speak in terms of "arbitrary *and* capricious" and use the two words synonymously, the Administrative Procedure Act uses the words disjunctively as "arbitrary, capricious, an abuse of discretion, *or* otherwise not in accordance with law." Consequently, it seems unnecessary to determine if "capricious" has some independent legal significance. It might also be appropriate to point out that some cases seem to apply or speak of the "substantial evidence" rule interchangeably with being

10. Jurisdiction would also appear proper under 28 U.S.C. § 1331. The amount in controversy is clearly in excess of $10,000 and the action "arises under" the Federal Medicare Act. *See* American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 36 S.Ct. 585, 60 L.Ed. 987 (1916); *Aquavella, supra,* 437 F.2d at 400 (Footnotes 9 and 10).

11. Sierra Club v. Hardin, 325 F.Supp. 99 (D.Ala.1971); Krawez v. Stans, 306 F.Supp. 1230 (E.D.N.Y.1969).

arbitrary and capricious.[12] As I understand the cases, however, an arbitrary decision is one lacking in rational basis because there is no evidence upon which the decision may be logically based. Review under this test is far more restricted than under the "substantial evidence" test. Logically, therefore, the initial inquiry should be whether the Appeals Committee decision was "arbitrary;" *i. e.*, whether there was any evidence upon which it could rationally determine that the transfer of funds constituted a "restricted gift" under HEW regulations.

Under the Medicare Act, the provider of services is reimbursed for the reasonable cost of services provided to Medicare patients. 42 U.S.C. § 1395f(b). The statute directs the Secretary of HEW to promulgate regulations to determine costs subject to certain limitations. One such limitation contained in 42 U.S.C. § 1395x(v)(1) is:

> Such regulations shall (A) take into account both direct and indirect costs of providers of services in order that, under the methods of determining costs, the costs with respect to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs . . . .[13]

Pursuant to the statute, regulations were adopted for determining how gifts to providers of services should be treated in computing costs of services. 20 C.F.R. 405.423 provides as follows:

> (a) *Principle.* Unrestricted grants, gifts, and income from endowments should not be deducted from operating costs in computing reimbursable costs. Grants, gifts, or endowment income designated by a donor for paying specific operating costs should be deducted from the particular operating cost or group of costs.

> (b) *Definitions*—(1) *Unrestricted grants, gifts, income from endowment.* Unrestricted grants, gifts, and income from endowments are funds, cash or otherwise, given to a provider without restriction by the donor as to their use.

Filed with plaintiff's motion for summary judgment as Exhibit "A" is the full transcript of the Appeals Committee hearing;[14] attached to the complaint as Exhibit "H" is the entire decision of the Appeals Committee in respect to the $600,000 transfers. The decision noted that the Hospital and the Medical School "were both parts of a university corporation" and that the legal structure of Temple University "was a single university corporation" and that "the entire management, control and conduct of the instructional, administrative and financial affairs of the university [was] vested in the board of trustees." The decision then sets forth:

> A note on the university statement of income and general fund surplus described the transaction as follows:

> > "In recognition of the use by the Medical School of the Hospital as a necessary and required adjunct of the Medical School teaching program, without which the School could not adequately fulfill its teaching responsibilities and functions, the dollar value of which is not capable of an exact determination, it was agreed to make an *unrestricted* contribution to the Hospital of $600,000 for the year ended June 30, 1967."

12. *E. g.*, Irvin v. Hobby, 131 F.Supp. 851, 865 (N.D.Iowa 1955):
   An Agency finding or conclusion of lack of evidence would be arbitrary and capricious if the record afforded no substantial basis for such a finding.

13. This section has recently been amended. 42 U.S.C. § 1395(x)(v)(1)(A).

14. Testimony at the hearing related only to the 1967 transfer. The facts concerning all three transfers are identical and counsel agreed that the decision on the 1967 transfer would be binding on all the transfers.

Dr. Shultz, the elected Comptroller of Temple University explained the transfers from the Medical School to the Hospital as, in effect, being a purely bookkeeping transaction "so that the Hospital's books didn't look so bad" (40).[15] The Hospital of Temple University had been incurring substantial losses because of caring for indigent persons for whom no reimbursement of any kind was available (40). Dr. Shultz further testified that transfers and adjustments between and among divisions and departments at the end of fiscal periods were customary, where surplus balances from certain programs were transferred to those showing losses (42). The particular transfers in question did not alter or change in any way the actual costs of operating the Hospital (42) or the total financial condition of the University (45). The decision to make the book-transfer was purely administrative, obtaining and requiring no approval from the University Board of Trustees (66–67).[16]

The Medical School and the Hospital were located in close, but separate buildings. Dr. Shultz testified that there was "no question" but that the Hospital was of "some intangible benefit to the Medical School" (43), and that the note in the annual report concerning the stated "unrestricted" gift was explained in terms of recognition of this intangible benefit (43).

A University memorandum between two of its vice-presidents explained the transaction as follows:

Obviously, the proximity and existence of the hospital is important to the Medical School in trying to produce not only technically trained physicians but also those who, through extensive exposure to a hospital setting, can and will move into their own practice with assurance, knowing that they can give the proper patient directions and recommendations. Such knowledge of all phases of hospital operations can only be acquired through an association with an institution as Temple University Hospital, while a member of the Medical School student body.

From a detailed analysis, it was deemed impossible to accurately determine the value of the benefits received by students from the association with Temple University Hospital. Therefore, the Medical School made an unrestricted contribution of $600,000 to the Hospital in recognition of permitting students to have free access to it thereby aiding their general sophistication and savvy.

One consideration in arriving at this figure was that during the 1966–67 academic year there were approximately 550 Medical School students in attendance, and between thirty-five and fifty graduate Medical School students in attendance. Thus, the total" "amount" of students would tend to round out to around six hundred, and it was estimated that the benefit per student . . . be in the order of $1,000 each.

"In view of the fact that the annual recorded costs of educating" Medical School students "at that time was close to $7,000 per student, it was judged that the benefits received by" the "students from" the "free access to the hospital were in the order of $1,000 per student. Consequently, $600,000 was arrived at arbitrarily, yet not without some reasonable relationship to the number of the students visiting the Hospital." (52–53)

The accountant from the accounting firm of Ernst & Ernst, who prepared the annual report for the Hospital, testified that there was "no valid evidence"

15. Number in parenthesis refers to the page number of Exhibit "A" being the trancript of the Appeals Committee hearing.

16. After 1969, Temple University, faced with the problems evinced in this litigation, ceased making the fiscal year-end transfers to the Hospital; as previously noted, this has in no way changed the financial condition of the University.

to support the transfer as "being directly related to any specific expenses or costs," and that the transfer was made "to bolster in some way what appeared to be a worsening capital picture" of the Hospital and was shown on the books as an "unrestricted gift reported in the nonoperating section on the income statement." (118–119). Ernst & Ernst treated the transfer as nonoperating income because the transfer "had no direct connection with any expenses and it had nothing to do with operating or running the hospital whatsoever." (120).

Mr. Murphy, an accountant who audited the accounts on behalf of Phila. Blue Cross expressed his opinion and reasons for treating the transfer as a "restricted gift" as follows:

> MR. MURPHY: In my judgment the Trustees of the University certainly would not make a gift or a transfer of funds capriciously. They are sound business men with judgmental decisions to be made, and therefore I consider that this gift or transfer would have to be in the nature of a restricted gift, not a fortuitous transfer of money.
>
> Now, we have heard several purposes today. The initial purpose as we were able to examine the documentation was set forth in the Hospital's Annual Report, and in reading that language which has been read several times, I was of the conclusion that this was a transfer of dollars to the Hospital. Very much the same character of many charges from the University, this was just the reverse, but for the purpose of reimbursing the University, or the Hospital, rather, for a cost which it had incurred in connection with the education of the interns or the total educational program for the doctors at the University, the students at the University, it could well be that if the definition in that journal or in that report is inaccurate it would still be, in my opinion, a restricted gift and the accounting would then have to change accordingly. (138–139)

Mr. Murphy was unable to identify specifically any costs that were incurred by the Hospital as, a result of the "free access of the hospital by the medical students" (162), and in determining that the gift was "restricted" he relied solely on the note appended to the annual report "to determine the character of the gift and the purpose to which it was intended." (163). It appears that Mr. Murphy, upon whose opinion the Appeals Committee relied heavily in its ultimate decision, confused possible monetary benefit to the students in having free access to the Hospital for study with "specific operating costs" to the Hospital, for which there is no evidence according to all witnesses.

■ The transcript of the Appeals Committee hearing and the decision of that Committee contain no evidence that the 1967 transfer from the Medical School to the Hospital was restricted in any way. The sole focus of the hearing testimony and opinion was the rationale for the transfer. In my opinion, the reason or motive for a gift (if indeed the transfer constituted a gift) has nothing to do with any restrictions placed upon the use of the gift. An individual might well be inclined to make a donation to a hospital of a specific amount of money that exactly equals the past annual cost of maintaining a particular hospital service, such as an X–Ray department, but if the money is donated without any restriction as to how the donated money is to be used, it would not be a restricted gift under HEW regulations. This is so, even if the donor expected that the donation would be used specifically for such purpose, and even if, in the absence of such a donation the X–Ray department would have to be closed down. At a minimum, the "gift" would have to be "designated by a donor for paying specific operating costs." 20 C.F.R. 405.423(a).

20 C.F.R. 405.423 states that "Unrestricted grants, gifts and income from endowments" should not be deducted whereas, grants, gifts and income from endowments "designated by a donor for

paying specific operating costs" should be deducted. Unrestricted grants or gifts are "funds, cash or otherwise, given to a provider without restriction by the donor as to their use." I interpret these clauses to mean that there must be an express restriction on the use to be made of the money, as opposed to a mere expectation that it will be used for a certain purpose. The regulations expressly provide that if the Hospital (provider) restricts a gift or grant for a specific purpose, such will not transform a gift unrestricted by the donor into a "restricted" gift for purposes of the regulations.

The regulations make clear under 405.423(c) that "[u]nrestricted funds . . . are generally the property of the provider to be used in any manner its management deems appropriate." There is not a scintilla of evidence that the book transfer at the end of the 1967 fiscal year of funds from the Medical School to the Hospital was to be applied or utilized in any particular or restricted way. All of the evidence is to the contrary. The transfer was simply to act as a "balancing" item against the overall indebtedness of the Hospital. The accountants treated it as nonoperating income, assigned to no particular department or branch of the Hospital.

A clearer case of an "unrestricted" transfer would be difficult to find. There is no evidence that the transferee of the funds required the funds to be applied for any purpose or to pay any particular debts. There was no indentifiable expense incurred that could even be correlated with the funds transferred. The accountant for the fiscal intermediary, Mr. Murphy, stated that in determining that the 1967 transfer was "restricted" he relied solely on the note attached to the annual reports. This note [17] expressly stated that it was an "unrestricted contribution." There is nothing in the note that in any way contradicts this assertion, and there is nothing in the record that indicates to the contrary.

I seriously doubt that the book-entry transfer between the two departments of the University at the end of the fiscal year, in order to give a more balanced appearance to its various programs constituted a "grant, gift or income from endowments" within the intendment of the HEW regulations. It certainly did not in any way enrich the owner and operator of the Hospital, Temple University. In addition, the fiscal-intermediary interpreted its regulations to mean that if a donation is made to cover a past incurred expense, this is a "restricted" gift. If such is a correct interpretation, then the regulations should have specifically so provided, because the regulations refer to a restriction by the donor as to the use to be made of the funds, and not as to the purpose of the donation.

I conclude that there is no evidence, and no rational basis upon which to base the finding and conclusion of the Appeals Committee that the transfer of the funds from the Temple University Medical School to the Temple University Hospital for the years 1967, 1968 and 1969 were "restricted gifts" within the regulations of HEW, 20 C.F.R. 405.423. The determination of the fiscal intermediary, and the determination of the Appeals Committee of BCA is, therefore, arbitrary and must be set aside.

A further comment should be made. Congress has amended the legislation, so that for all accounting periods "ending on or after June 30, 1973," [18] there shall be in effect a Provider Reimbursement Review Board before whom provider-fiscal-intermediary disputes shall be heard, and the "substantial evidence" rule is to be applied. From an adverse administrative determination there is an express

17. This same note appeared on finance reports for fiscal years 1968 and 1969.

18. 1 U.S.Code Cong. & Admin.News, p. 1663 (1972). But see, the legislative history which refers to accounting periods "beginning after June 30, 1971." 3 U.S. Code Cong. & Admin.News, p. 5310 (1972).

right of appeal, in specified situations, to the district courts, in accordance with the Administrative Procedure Act, 5 U. S.C. § 701 et seq.[19] Act approved October 30, 1972, P.L. 92–603. Consequently, the present action may prove to be unique concerning the legal questions involved, and the interpretation of HEW regulations contained in 20 C.F.R. 405.-423.

Because the decision of the Appeals Committee has been found to be reviewable and that decision has been set aside as being arbitrary, it becomes unnecessary to determine the plaintiff's constitutional argument.

---

19. Section 243(f) of the Social Security Amendments of 1972, 86 Stat. 1329 provides:

A decision of the Board shall be final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses or modifies (adversely to such provider) the Board's decision. In any case where such a reversal or modification occurs the provider of services may obtain a review of such decision by a civil action commenced within 60 days of the date he is notified of the Secretary's reversal or modification. Such action shall be brought in the district court of the United States for the judicial district in which the provider is located or in the District Court for the District of Columbia and shall be tried pursuant to the applicable provisions under chapter 7 of title 5, United States Code, notwithstanding any other provisions in section 205.