**AMI–CHANCO, INC., etc.**

**v.**

**The UNITED STATES.**

**No. 51–75.**

United States Court of Claims.

May 17, 1978.

Robert A. Klein, Los Angeles, Cal., for plaintiff; Weissburg & Aronson, Inc., Los Angeles, Cal., of counsel.

Arlene Fine, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Before COWEN, Senior Judge, NICHOLS and BENNETT, Judges.

## ON THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT

COWEN, Senior Judge:

Plaintiff, AMI–Chanco, Inc. (Chanco) is a California public corporation which manages over 20 hospitals participating in the Medicare program. On this appeal plaintiff seeks summary judgment for the amount of $260,355 in "stock maintenance costs" for its three fiscal years 1969, 1970 and 1971, on the ground that these are indirect costs of patient care and are thus reimbursable to plaintiff under 42 U.S.C. §§ 1395f(b)[1] and 1395x(v)(1)(A)[2] (Supp. V 1975). Plaintiff's fiscal intermediary, the Blue Cross Association, denied plaintiff's claim for reimbursement of these costs, and the intermediary's Medicare Provider Appeals Committee upheld that decision. Plaintiff argues that the Medicare Provider Reimbursement Manual guidelines, on which the fiscal intermediary grounded its decision, are arbitrary and capricious in light of the statutory directives and pertinent regulations. For the reasons to be set forth,[3] we agree with plaintiff's contentions

---

1. The section provides:

"The amount paid to any provider of services with respect to services for which payment may be made under this part shall * * * be * * * (A) *the reasonable cost* of such services, as determined under section 1395x(v) of this title * * *." (Emphasis added.)

2. The section provides:

"The reasonable cost of any services shall be *the cost actually incurred*, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services

* * *. Such regulations shall (i) take into account both *direct and indirect costs* of providers of services * * * in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter *will not be borne by individuals not so covered*, and the costs with respect to individuals not so covered will not be borne by such insurance programs * * *." (Emphasis added.)

3. In light of this disposition of the case, we need not reach two other difficult issues raised by the plaintiff. The first involves the retroactive application of the pertinent Provider Reimbursement Manual guidelines to the years in question. The delicate balancing test which

and hold that plaintiff is entitled to recover the proportion of its stock maintenance costs which is properly allocable to the Medicare patients served by its member hospitals during the 3 years in issue.

## I.

We will not elaborate on the various rights and obligations of providers of Medicare services. For a general discussion in this regard, see our decisions in *Whitecliff v. United States*, 210 Ct.Cl. 53, 536 F.2d 347 (1976), *cert. den.* 430 U.S. 969, 97 S.Ct. 1652, 52 L.Ed.2d 361 (1977); *Overlook Nursing Home, Inc. v. United States*, 556 F.2d 500, 214 Ct.Cl. 60 (1977); *Ulman v. United States*, 558 F.2d 1, 214 Ct.Cl. 308 (1977); *St. Elizabeth Hospital v. United States*, 558 F.2d 8, 214 Ct.Cl. 322 (1977); and *Summit Nursing Home, Inc. v. United States, supra,* note 3.

■ As we indicated above, the costs in issue here are labeled "stock maintenance costs" for Medicare reimbursement purposes by the H.E.W. Provider Reimbursement Manual. They include: (1) costs of reports to shareholders and costs of shareholders' meetings; (2) proxy costs, stock transfer fees, and stock exchange registration fees, and (3) accounting and legal fees incurred in connection with requirements of the Securities and Exchange Commission.[4] The issue we decide today involves the validity of two sections of the Provider Reimbursement Manual, which were adopted by the Social Security Administration during 1973:

(1) Section 2134.9, which read:

The following types of costs relevant to the proprietary and equity interests of the stockholders, but not related to patient care, are excluded from allowable costs: costs incurred primarily for the benefit of stockholders or other investors, including, but not limited to, the costs of stockholders' annual reports and newsletters, annual meeting, mailing of proxies, stock transfer agent fees, stock exchange and registration fees, stockbroker and investment analysis, and accounting and legal fees for consolidating statements for SEC purposes.

(2) Section 2150.2B, which read:

Costs relating to "corporate stock maintenance," including but not limited to costs of annual reports and newsletters to stockholders, annual meetings, mailing of proxies, stock transfer agent fees, stock exchange registration fees, stockbroker and investment analysis, accounting and legal fees for consolidating statements for SEC purposes * * * are not allowable.[5]

Plaintiff argues, and we agree, that these two provisions are arbitrary, capricious and not in accordance with law, and therefore that there was no rational basis for the disallowance of the claimed costs.

## II.

We find that H.E.W. acted arbitrarily in adopting and enforcing the provisions in question because they are not consistent with the basic objectives of the enabling legislation, with other Medicare regulations adopted pursuant to that legislation, or with other government regulations which allow the same costs in other contexts.

---

may come into play in the resolution of such an issue is discussed at some length in *Summit Nursing Home, Inc. v. United States*, 215 Ct.Cl. ‥ , 572 F.2d 737 (1978). The second issue, whether the Provider Reimbursement Manual guidelines applied by the fiscal intermediary are substantive rules rather than interpretative rules, such that plaintiff was not afforded the proper procedural protections provided under the Administrative Procedure Act, presents a frequently discussed problem, most recently addressed by this court in *Gosman v. United States*, 215 Ct.Cl. , 573 F.2d 31 (1978).

4. Stock maintenance costs also include "acquisition costs of new facilities." Plaintiff, however, has advised us that acquisition costs are not in issue in this proceeding, and we hereby specifically exclude such costs from our holding in this case.

5. Section 2150.2B also disallowed reimbursement for certain "capital expenditures" such as "costs incident to reorganization." These costs are not in issue in this proceeding, however, and we render no opinion on the validity of their disallowance.

### A. *The enabling legislation.*

Congress had directed that Medicare providers should be reimbursed for the indirect costs of patient care. 42 U.S.C. § 1395x(v)(1)(A)(i) (Supp. V 1975). The Secretary of H.E.W. has appropriately promulgated interpretative regulations which recognize that allowable costs include those "which are *appropriate and helpful* in developing and maintaining the operation of patient care facilities and activities· * * [and] are usually costs which are common and accepted occurrences in the field of the provider's activity." (Emphasis added.) 20 C.F.R. § 405.451(b)(2) (1977). There are several reasons for our holding that the statute and the regulations contemplated reimbursement for stock maintenance costs. First, a corporate provider of services, such as Chanco, is expressly recognized as an acceptable provider of services under H.E.W. interpretation of the Act. 20 C.F.R. §§ 405.429(a)(2) and 405.603(b) (1977). Next, as a public corporation operating in California, Chanco is required by state and federal securities law to incur stock maintenance costs as part of its operating budget; those costs are necessarily incurred in providing services to Medicare patients. California law also demands that Chanco hold an annual meeting of shareholders to elect directors of the corporation, and to send an annual report to shareholders within 20 days after the close of its fiscal year. California Corporations Code §§ 301, 1501. Federal securities law requires Chanco as a public corporation to incur various accounting. legal, printing, and other fees in order to meet the requirements of the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa (1976), and the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (1976). The government defends its disallowance of the above legally mandated costs on the ground that they are costs incurred solely for the benefit of investors. It may be that these laws were enacted for the benefit of investors, but the fact remains that Chanco must legally incur these costs in order that it may attract the equity capital which is necessary for its operation of facilities to provide patient care services.

Thus to the extent that Chanco provides services to Medicare recipients, these stock maintenance costs are indirect costs of serving these patients.

The Provider Reimbursement Manual provisions in question also conflict with the statutory directive that costs of treating Medicare patients not be shifted to the non-Medicare hospital population. 42 U.S.C. § 1395x(v)(1)(A). The legislative history illuminates the reasons for that provision:

> * * * we don't want to set up a program here that is going to pay 90 percent of the costs of these people, and the rest of the folks * * * have 10 percent added to their hospital costs at the same time. That wouldn't be fair to the public. I don't think there is any argument about that.

Comments of Chairman Wilbur Mills, Medical Care for the Aged, Executive Hearings before the Committee on Ways and Means, House of Representatives, 89th Cong., 1st Sess. (1965), vol. 1, at 417. Yet, if the costs in issue are finally disallowed, Chanco will be compelled to collect from its non-Medicare patients stock maintenance costs which are justly attributable to the cost of treating Medicare patients.

### B. *Other Medicare regulations.*

The Manual provisions in question are also not consistent with other Medicare regulations adopted pursuant to the enabling legislation. Such other regulations permit reimbursement for costs which are either very similar to or are generally inclusive of the costs defined by H.E.W. as stock maintenance costs. They include: (1) general administrative and accounting costs, (2) costs of corporate organization, (3) costs of annual meetings and reports when incurred by nonprofit corporations, (4) costs of attracting equity capital, and (5) costs of corporate financing.

#### 1. *General administrative and accounting costs.*

The stock maintenance costs which Chanco has incurred have been identified by accountants as part of a corporation's gen-

eral and administrative expense. *See* Simons & Karrenbrock, Intermediate Accounting, 4th Ed., at 34. Thus, they would appear to be reimbursable under a Medicare regulation which provides for payment of costs determined in accordance with "standardized definitions, accounting, statistics, and reporting practices which are widely accepted in the hospital and related fields * * *." 20 C.F.R. § 405.406(a) (1977).

## 2. Costs of corporate organization.

In its Provider Reimbursement Manual, H.E.W. has authorized reimbursement of costs of corporate organization, including legal and accounting fees, directors' fees, incorporation fees, expenses of organization meetings of directors and stockholders, and other costs required to create the corporate entity. HIM–15 § 2134.1A. We fail to perceive any rational basis for treating the costs of creating a corporate entity as allowable, indirect expenses of patient care, while disallowing stock maintenance costs that are essential to the maintenance of the corporate organization.

## 3. Annual meetings and reports of nonprofit corporations.

There is no provision in the Medicare regulations which denies nonprofit corporations reimbursement for the costs of annual meetings and reports—the same costs which are denied to profit-making corporations such as Chanco. The reports by nonprofit providers of Medicare services are indistinguishable, in substance, from reports required by the SEC with respect to publicly held investor-owned corporations. It is difficult to escape the conclusion that H.E.W.'s disparate treatment is arbitrary, especially when one considers that corporate providers of medical care are encouraged by the Medicare regulations to treat Medicare patients. *See* 20 C.F.R. §§ 405.429(a)(2) and 405.603(b) (1977). Furthermore, the distinction made by H.E.W. collides with another Medicare regulation which prohibits inequitable application of cost reimbursement principles between nonprofit organizations and profit-making organizations. 20 C.F.R. § 405.402(b)(5) (1977).

## 4. Costs of attracting equity capital.

The enabling statute and pertinent regulations make it the policy of the Medicare program to attract investment capital to corporate providers of Medicare services. The Act provides for a return on investment as follows:

> Such regulations in the case of extended care services furnished by proprietary facilities shall include provision for specific recognition of a reasonable return on equity capital, including necessary working capital, invested in the facility and used in the furnishing of such services, in lieu of other allowances to the extent that they reflect similar items. * * *

42 U.S.C. § 1395x(v)(1)(B) (Supp. V 1975).

Regulations adopted pursuant to this provision recognize that a "return on investment * * * is needed to avoid withdrawal of capital and to attract additional capital needed for expansion." 20 C.F.R. § 405.429(b)(1) (1977).

By directing that corporate providers shall receive a reasonable return on equity capital, Congress has declared that it considers a reasonable return on investment to be one of the costs of patient care which is reimbursable under the Act. Surely, if Congress meant to bolster the effectiveness of the Medicare program by offering the incentive of a return on equity to investors of capital, it also intended to provide reimbursement for stock maintenance costs, which by their very definition are essential elements of the process of attracting the equity capital necessary to provide patient care services. In fact, it is a contradictory policy which encourages the attraction of investment capital but disallows the costs of doing so, on the grounds that the latter costs are not related to patient care.

## 5. Costs of corporate financing.

■ Pertinent Medicare regulations also reimburse other methods of corporate financing. Interest paid on bonds and notes is an allowable cost. Provider Reimburse-

ment Manual HIM–15 §§ 212–212.3. Expenses incurred in connection with bond issuances, including professional fees, underwriters' fees, appraisers' fees, printing costs, and other similar costs, are also defrayed. *Id.* Obviously, these provisions evidence a policy within H.E.W. to permit reimbursement for debt financing as an appropriate cost of providing Medicare services. Yet, it is a basic principle of obtaining debt financing that the greater an amount of equity capital a corporation has in relation to its debt, the less it pays to borrow funds. *See* Nemmers & Grunewald, Basic Managerial Finance, 2d Ed. (1975), at 379. And, as we have noted previously, stock maintenance costs are among those costs necessarily expended in attracting equity capital—so much so that the law requires that they must be incurred by an investor-owned corporation such as plaintiff. It follows that in order to obtain the best possible debt financing, plaintiff cannot avoid expenditures for stock maintenance.

In a decision of September 2, 1977, the Provider Reimbursement Review Board ruled in an appeal by another provider, American Medical International, that stock maintenance costs are allowable. The decision stated in part:

Furthermore, loan agreements between the Parent Company and its lenders contain a covenant with the lender that the Parent Company will maintain its corporate status, rights, privileges and franchises. These are common covenants of major borrowings which are inserted for the protection of the lender to insure that the corporate status will not materially change during the term of the loan. Lenders are concerned that large borrowers continue to maintain their stock on the public market to insure the integrity of the equity cushion underlying the loan. Each of the costs which have been identified as stock maintenance costs would be required to be incurred as a condition to satisfying the loan agreements, and since

costs associated with borrowings have clearly been allowed by the program, no distinction should be made with respect to the costs in issue here.[6]

■ In summary, we conclude the refusal to pay stock maintenance costs is incompatible with the above-discussed regulations which authorize the reimbursement of corporate debt financing.

C. *Other federal agency regulations.*

Although it is not a controlling factor, the treatment accorded in the regulations of other agencies to expenses of the kind involved here, lends support to plaintiff's position. For example, the Commissioner of Internal Revenue has ruled that certain stock transfer fees and costs of maintaining stockholder records are deductible from taxable income as ordinary and necessary business expenses. In reaching his conclusion, the Commissioner explained as follows:

Although a corporation is formed primarily to engage in a particular business, *the corporate organization must be maintained in order to carry on the business* for which it is formed. This involves the holding of meetings of the stockholders to elect the officers through which the corporation acts and to vote on matters that require stockholders' sanction. *For such purpose proper records* showing the names and addresses of the stockholders *must be maintained.* (Emphasis added.)

Rev. Rul. 69–615, 1969–2 C.B. 26.

Also, in the area of government procurement, it is the policy of the government to approve or otherwise sanction such costs on the ground that they are part of the corporation's general and administrative costs, *Northrop Aircraft Co.,* (1950) B.C.A. 76, Government Contracts Report, para. 60,869; or are indirect costs subject to reimbursement, Armed Services Procurement Regulations § 15–205.24; or are "reasonable costs" for purposes of payment to suppliers to the

---

**6.** Decision No. CN 75–1426 at 23: attached as Exhibit II to Defendant's moving brief. Although defendant has informed the court that the Administrator of the Health Care Financing Administration of H.E.W. reversed the Board's decision on November 4, 1977 (Defendant's Reply Brief at p. 2), we agree with the Board's reasoning and the result it reached.

federal government, Federal Procurement Regulations § 1–15.205.24.

### III.

■ We are cognizant that:

\* \* \* A court has no warrant to set aside agency action as arbitrary or capricious when those words mean no more than that the judges would have handled the matter differently had they been agency members. Judicial intervention must, instead, be rested upon a demonstration that the agency action has transgressed the statutory boundaries \* \*.

*Calcutta E. Coast of India & E. Pakistan/U.S.A. Conf. v. Federal Maritime Commission,* 130 U.S.App.D.C. 261, 264, 399 F.2d 994, 997 (1968). The government cites two prior decisions of this court, *Zachry Co. v. United States,* 344 F.2d 352, 170 Ct.Cl. 115, (1965); and *Schellfeffer v. United States,* 343 F.2d 936, 170 Ct.Cl. 178 (1965), to remind us that administrative interpretations of a statute are entitled to great weight and are not to be ignored unless unreasonable. The government further informs us that Congress has granted the Secretary broad discretion to formulate regulations under the Medicare Act. *Springdale Convalescent Center v. Mathews,* 545 F.2d 943, 951 (5th Cir. 1977). We think that our decision today is not inconsistent with the cited cases. In *Springdale Convalescent Center,* the Fifth Circuit declared that "the Secretary's discretion is not unfettered." *Id.* at 952.

It is not often that we face circumstances so compelling that the ends of justice persuade us to characterize an administrative decision as arbitrary or capricious. However, we find that the decision in this case is so inconsistent with the statutory purpose and other regulations of the same agency that we cannot uphold that decision. Although "stock maintenance expenses" are a special classification coined by H.E.W., we find that they are actually general and administrative expenses, which are indirectly related to and necessarily incurred in providing the Medicare services involved in this case.

The basis for our decision has precedent in the decisions of other federal courts which have labeled as arbitrary administrative decisions respecting expenses incurred by providers of Medicare services. *Temple University v. Associated Hospital Services,* 361 F.Supp. 263, 273–74 (D.C.1973); *South Boston General Hosp. v. Blue Cross of Virginia,* 409 F.Supp. 1380, 1385 (W.D.Va.1976). Moreover, we follow the holding of the Supreme Court that an agency construction of a statute will be affirmed only if it "has reasonable basis in law."

\* \* \* courts \* \* \* "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." \* \* \* "The deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia. \* \* \* "
*Volkswagenwerk v. Federal Maritime Commission,* 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968), *citing NLRB v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); and *American Ship Building Co. v. NLRB,* 380 U.S. 300, 318, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). *See Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). In the final analysis, a prior decision of this court summarizes our conclusion regarding the disposition of this case:

\* \* \* the \* \* \* Board and the Secretary \* \* \* have not followed \* \* \* the statute; they have not been consistent in their administration of the law, and their decisions are, in part, based upon the application of a regulation in a manner which is repugnant to the provisions of the statute \* \* \*. For these reasons, we reverse the administrative decisions.

*Farrell Lines, Inc. v. United States,* 499 F.2d 587, 597, 204 Ct.Cl. 482, 498 (1974).

### IV.

The government also contends, apparently as an alternative argument, that the

statutory provision made by Congress for a return on equity to corporate providers was intended to include reimbursement for stock maintenance costs within the specified percentage rate for a return on equity. In section 1861(v)(1)(B) of the Social Security Act, Congress set the rate of return at not more than 1.5 times the average rate for interest paid on certain obligations issued to the Federal Hospital Insurance Trust Fund.

We find that there is no merit in this belated contention, which was not raised in the administrative proceedings. The government cites no legislative history, documentation, or authority of any kind in support of this proposition. Its argument is based almost solely on its unsupported interpretation of the provision in 42 U.S.C. § 1395x(v)(1)(B) (Supp. V 1975) that a reasonable return on equity is to be paid "in lieu of other allowances to the extent that they reflect similar items." The government says that stock maintenance costs are such "other allowances." In the absence of any legislative history to the contrary, we find that a plain reading of the statute indicates that the payment of the return on equity capital is in lieu of other "similar" payments *for the use of capital*. Reimbursements for stock maintenance costs are not similar to payments for use of capital.

That the government's position is legally erroneous is, we think, clearly demonstrated in the following excerpt from the decision of September 2, 1977, by the Provider Reimbursement Review Board in the *Appeal of American Medical International.*[7]

> Moreover, the rate of return is a market concept, which varies with market conditions while most stock maintenance costs are fixed costs impervious to market variances. The effect of including a fixed cost within a variable market rate will cause the rate of return to vary from the market rate in differing proportions. Since both the Medicare Law and the Regulations provide that the rate of return will be tied to 150 percent of the yields on loans of the Federal Hospital Insurance Trust Fund, it clearly violates that Law and Regulation to offset a part of that return by disallowing stock maintenance costs. [Defendant's Exhibit II, pp. 24–25.]

Furthermore we find unconvincing the government's argument that Congress demonstrated its intention to reimburse stock maintenance costs as part of the rate of return on equity by not enacting the section providing for a rate of return until a year or so after the original Medicare legislation was passed. If the delay in enactment of section 1395x(v)(1)(B) means anything at all, we think it indicates a Congressional intent that the rate of return on equity capital was to be allowed, wholly apart from and independent of other indirect costs, such as stock maintenance costs, which were covered by previously enacted legislation.

V.

For the reasons set out above, plaintiff's motion for summary judgment is granted, defendant's cross-motion for summary judgment is denied, and the case is remanded to the trial division for a determination of the amount plaintiff is entitled to recover in accordance with this opinion.