### WESTERN COAL TRAFFIC LEAGUE and its Members, et al., Petitioners,

v.

### UNITED STATES of America and Interstate Commerce Commission, Respondents.

Nos. 81–4257, 81–4259, 81–4277, 81–4299, 81–4334, 81–4347, 81–4354, 81–4357, 81–4365 to 81–4369, 81–4373, 81–4415, 81–4423 and 82–4021.

United States Court of Appeals, Fifth Circuit.

Dec. 8, 1982.

Opinion on Granting of Rehearing En Banc March 7, 1983.

---

Richard A. Allen, Kathleen M. Dollar, Timm L. Abendroth, Gen. Counsels, ICC, William F. Smith, Atty. Gen., U.S. Dept. of Justice, John J. Powers, III, Antitrust Div., James H. Laskey, Washington, D.C., for respondents in all cases.

J. David Forsyth, Cicero C. Sessions, New Orleans, La., William L. Slover and Donald J. Avery, Washington, D.C., for Western Coal Traffic League and Its Members, et al.

C. Michael Loftus, Washington, D.C., for Western Coal Traffic League and Its Members, et al., Consumer Owned Power Coalition, Eastern Coal . Transp. Conference, Western Coal Traffic League and Its Members.

J. Raymond Clark, Mary Todd Foldes, Washington, D.C., for Arkansas-Missouri Power Co., et al.

Edward B. Poitevent, II, New Orleans, La., for Arkansas-Missouri Power Co., et al. and Middle South Utilities.

John M. Cleary, Nicholas J. DiMichael, Washington, D.C., for Gulf States Utilities Co., et al.

David H. Baker, Dickson R. Loos, Barry Roberts, Washington, D.C., for The Aluminum Ass'n, Inc.

John Guandolo, Washington, D.C., for Consumers Power Co.

Charles J. McCarthy, Washington, D.C., for Commonwealth Edison Co., et al.

Leonard M. Trosten, Harry H. Voigt, Michael F. McBride, Daniel J. Conway, Washington, D.C., for Edison Elec. Institute.

John F. Donelan, John K. Maser, III, Washington, D.C., for American Paper Institute, Inc., The National Indus. Traffic League, Carolina Power & Light Co., et al.

John H. LeSeur, Slover & Loftus, Washington, D.C., for Consumer Owned Power Coalition, and Eastern Coal Transp. Conference.

Edmund E. Harvey, Washington, D.C., for Copper Development Ass'n, Inc.

R. Dennis Wright, Mark G. Flaherty, Kansas City, Mo., for Nebraska Public Power Dist.

Harold E. Spencer, Richard S.M. Emrich, Chicago, Ill., for International Minerals & Chemical Corp. and The Fertilizer Institute.

John R. Molm, Atlanta, Ga., for Alabama Power Co., et al.

John L. Oberdorfer, Harvey J. Baker, Washington, D.C., for National Coal Ass'n & Chemical Mfrs. Ass'n.

Paul M. Donovan, Gerald L. Richman, Washington, D.C., for The Chlorine Institute, Inc.

Mike Miller, Fargo, N.D., John I. Finsness, Director of Traffic, North Dakota Pub. Serv. Comm., Daniel S. Kuntz, Asst. Atty. Gen., Bismarck, N.D., for The North Dakota Public Service Comm., et al.

Martin W. Bercovici, Lawrence P. Halprin, Washington, D.C., for The Committee on Transp. and Distribution of the Society of Plastic Ind., Inc.

Dennis N. Barnes, Howard T. Weir, Washington, D.C., for Electric Fuels Corp.

Frederick W. Claybrook, Jr., Herbert J. Martin, Karen Shoos Lipton, Washington, D.C., for American Iron and Steel Institute.

David A. Sutherlund, Washington, D.C., for Coastal States Energy Co. and National Ass'n of Mfrs.

Frederick P. Furth, Bruce J. Wecker, San Francisco, Cal., for Kellogg Co.

John J. Powers, III, James H. Laskey, Antitrust Div., U.S. Dept. of Justice, Kenneth P. Kolson, Timm L. Abendroth, Washington, D.C., for U.S.A. and I.C.C.

Michael Boudin, Washington, D.C., Walter J. Suthon, III, New Orleans, La., James R. Atwood, Washington, D.C., for The Ass'n of American Railroads.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Middle South Utilities.

Before BROWN, RUBIN and REAVLEY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The Railroad Revitalization and Regulatory Reform Act of 1976 (the 4R Act)[1] was designed to eliminate needless regulatory restraints on railroads and to prescribe rate-making practices that would both encourage effective competition and protect consumers.[2] As one of its measures to achieve this, Congress limited the authority of the Interstate Commerce Commission to suspend a railroad rate on the basis that it is unjustly or unreasonably high. The Commission now has no jurisdiction to review any rate unless it finds that the rail carrier defending the rate can exclude effective competition for the transportation to which the rate applies. The carrier's power to exclude such competition is called "market dominance."

The Commission has adopted what it terms guidelines, but considers to be regulations, for deciding whether a carrier has market dominance. Under the guidelines, the Commission may consider evidence that other carriers or modes of transportation compete for the same movement of the product to which the rate applies. Evidence is also admissible that transportation of substitute products (product competition) or transportation of the same product from other places (geographic competition) provides less direct, but potentially equally effective, competition. When such evidence is considered, the number of rates immunized from regulation is increased.

Several organizations representing businesses and consumers that would be adversely affected by increases in various rail rates challenge the validity of the regulations on the ground that they exceed the Commission's statutory authority and on the further ground that the regulations do not comply with the Commission's statutory mandate to promulgate standards and procedures that facilitate market dominance determinations.

They also challenge other Commission decisions in the same regulations. The Commission has announced that user investments in rail-related facilities will not create a presumption of market dominance. Evidence of investments made in the future will not be admitted to show market dominance; evidence of past investments will be admitted but will create no presumption. In addition the Commission has abandoned the presumptions of market dominance formerly drawn from market share data and from cost/price ratios.

The Commission is joined in defending its actions by the Department of Justice and a number of intervenors including the Association of American Railroads and several railroad companies.

We conclude that the statute limits the definition of market dominance to transportation of the same product from the same origin to the same destination. The Commission's definition of market dominance is, therefore, invalid. Because

1. Pub.L. No. 94–210, 90 Stat. 31 (1976), to be incorporated into the U.S.Code as part of the Revised Interstate Commerce Act, 49 U.S.C. § 10101 et seq.

2. Senate Conference Report No. 595, 94th Cong., 2d Sess. 134, reprinted at 1976 U.S.Code Cong. & Ad.News 14, 148, 149.

the Commission must reconsider its definition, and must revise the standards and procedures adopted to implement it, any evaluation of those standards and procedures in their present form is unnecessary. We conclude, however, that the Commission did not exceed its statutory authority in adopting guidelines that describe the kind of evidence it will consider and the weight it will give such evidence.

## I.

We preface the factual background with a review of established precepts. The administrative agency charged with executing a statute has primary responsibility for determining the scope of its authority.[3] A reviewing court may not set aside the agency's interpretation of the statute that authorizes it to act merely because the judges would have interpreted the statutory language differently.[4] When, pursuant to congressional mandate, an agency adopts regulations to implement the statute it is charged with administering, the agency's interpretation of the statute is entitled to even greater weight.[5] Such regulations can be set aside only if the agency has exceeded its statutory authority or if its regulations so far depart from the statutory purpose that they can be stigmatized as "arbitrary or capricious," or "an abuse of

discretion," or "otherwise not in accordance with law."[6]

These terms are necessarily imprecise for they do not express a formula. When Congress has chosen an administrative agency to fulfill both executive and quasi-legislative functions, a court reviewing the agency's reading of the governing statute must take into account both the congressional grant of discretion to the agency and the agency's expertise. Judicial review is not to be exercised with the zeal of a pedantic schoolmaster who grades papers for a single correct answer, but with the respect that is due responsible and experienced government officials themselves charged with duties of national importance.

Nonetheless, a reviewing court has the duty to determine whether an agency has transgressed the bounds fixed by Congress,[7] else both judicial review and the constitutional stricture that ultimate legislative power not be delegated would both be meaningless. "[C]ourts are not bound to accept the administrative construction of a statute regardless of consequences."[8] While administrative agencies are expert in technical problems within their jurisdiction, they enjoy no special skill in statutory interpretation, an area in which courts are

3. *Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448, 456 (1977); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); *Williams v. St. Clair,* 610 F.2d 1244, 1249 (5th Cir.1980); *Belenke v. SEC,* 606 F.2d 193, 197 (7th Cir.1979); *Atchison, T & S.F. Ry. Co. v. ICC,* 580 F.2d 623, 629 (D.C.Cir.1978).

4. *Herweg v. Ray,* 455 U.S. 265, 277, 102 S.Ct. 1059, 1067, 71 L.Ed.2d 137, 147–48 (1982); *Batterton v. Francis,* 432 U.S. at 425–26, 97 S.Ct. at 2405, 53 L.Ed.2d at 456–57; *Unemployment Comm'n of Territory of Alaska v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 250, 91 L.Ed. 136 (1947); *American Telephone & Telegraph Co. v. United States,* 299 U.S. 232, 235–37, 57 S.Ct. 170, 172, 81 L.Ed. 142 (1936); *Mid-Louisiana Gas Co. v. Federal Energy Reg. Com'n,* 664 F.2d 530, 534 (5th Cir.1981).

5. *Batterton v. Francis,* 432 U.S. at 425–26, 97 S.Ct. at 2405–06, 53 L.Ed.2d at 456–57; *Mourning v. Family Publications Service, Inc.,* 411

U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318, 329 (1973); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123, 131 (9th Cir. 1980).

6. 5 U.S.C. § 706(2)(A) (1976); *Batterton v. Francis,* 432 U.S. at 425–26, 97 S.Ct. at 2405–06, 53 L.Ed.2d at 457; *American Trucking Association, Inc. v. United States,* 642 F.2d 916, 920 (5th Cir.1981); *Ami-Chanco, Inc. v. United States,* 576 F.2d 320, 326 (Ct.Cl.1978).

7. *Intern. Broth. of Teamsters, Etc. v. Daniel,* 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808, 820 n. 20 (1979); *Zuber v. Allen,* 396 U.S. 168, 193, 90 S.Ct. 314, 328, 24 L.Ed.2d 345, 360 (1969); *N.L.R.B. v. Brown,* 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839, 849 (1965).

8. *Estate of Sanford v. Commissioner,* 308 U.S. 39, 52, 60 S.Ct. 51, 60, 84 L.Ed. 20, 27 (1939).

the final authority.[9] For these reasons a court reviewing an agency's interpretation of its governing statute is not subject to the same constraints that apply when it reviews the procedures the agency adopts to fulfill its mandate.[10]

## II.

For almost a century railroad rates, unlike prices charged in most sectors of the American economy, have been stringently regulated. Tariff rates could be changed only after the long delay occasioned by administrative litigation and review under the substantive standards of the Interstate Commerce Act. In 1976 Congress found that, due in no small part to excessive regulation, railroad facilities had deteriorated, return on investment was far below the cost of capital, and a succession of major railroad bankruptcies had occurred.[11]

At the same time, the central premise of maximum rate regulation, that the railroads had a transportation monopoly requiring control lest it become a monster, had itself become outdated. Although railroads dominated freight traffic in the United States when the Act was passed in 1887, railroads today carry only a third of intercity freight tonnage and compete in such traffic with motor carriers, barges, pipelines, airlines, and other forms of transportation.[12] "[T]here are few significant commodities which are not practically susceptible to transportation by at least two competing modes of surface transportation[.]" [13]

Before 1976, all rail rates were required to be "just and reasonable." [14] The Commission had authority to regulate any rates that did not meet this standard. In adopting the 4R Act, Congress sought to restore financial stability to the railroad industry by reducing regulatory restraints on railroad pricing decisions. The Act permits the Commission to consider whether a rate is reasonable only if the Commission first determines that the rail carrier has "market dominance *over the transportation to which* [the] *particular rate applies.*" [15] "Market dominance" was originally defined as "an absence of effective competition from other carriers or modes of transportation *for the traffic or movement to which a rate applies.*" [16] That language was subsequently revised, without substantive change, when the Interstate Commerce Act was recodified in 1978.[17] In the 4R Act, Congress directed the Commission to establish, by rule, standards and procedures for making market dominance determinations.[18] The

---

9. *Fed. Elec. Com'n v. Dem. Senatorial Campaign Com.,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23, 29–30 (1981); *Hardin v. Kentucky Utilities Co.,* 390 U.S. 1, 14, 88 S.Ct. 651, 658–59, 19 L.Ed.2d 787, 797 (1968) (Harlan, J., dissenting), *quoted in Barlow v. Collins,* 397 U.S. 159, 166, 90 S.Ct. 832, 837, 25 L.Ed.2d 192, 199 (1970); 4 K. Davis, Administrative Law Treatise § 30.09 (2d ed.1958).

10. *Compare Vermont Yankee Nuclear Power Corp. v. National Resources Defense Counsel,* 435 U.S. 519, 543–44, 98 S.Ct. 1197, 1211–12, 55 L.Ed.2d 460, 479 (1978).

11. Senate Rep. No. 499, 94th Cong., 2d Sess. pp. 2–3, *reprinted at* 1976 U.S.Code Cong. & Ad.News 14, 15–17.

12. *Id., reprinted at* 1976 U.S.Code Cong. & Ad. News 16.

13. Illinois Cent. Gulf R.—Acquisition—G., M. & O., et al., 338 I.C.C. 805, 836 (1971).

14. Interstate Commerce Act, 49 U.S.C. § 1(5) (1976).

15. 49 U.S.C. § 10701a(b)(1) (Supp. IV 1980) (emphasis added).

16. Pub.L. No. 94–210, § 202(b), 90 Stat. 31 (1976), codified at 49 U.S.C. § 1(5)(c) (1976) (emphasis added).

17. Pub.L. No. 95–473, 92 Stat. 1337 (1978). It now reads "*transportation* to which the rate applies" instead of "*traffic or movement* to which [the] rate applies." 49 U.S.C.A. § 10709(a) (West Special Pamphlet 1982).

18. The pertinent statutory language, set forth in the 4R Act, § 202(b), *codified at* 49 U.S.C. § 1(5)(d) (1976), *repealed by* Pub.L.No. 95–473, § 4(b), (c), 92 Stat. 1337, 1466–70 (1978), was: Within 240 days after the date of the enactment of this subdivision, the Commission shall establish, by rule, standards and procedures for determining, in accordance with Section 15(9) of this part, whether and when a carrier possesses market dominance over a service rendered or to be rendered at a particular rate or rates. Such rules shall be designed to provide for a practical determination without administrative delay.

Commission was instructed to solicit and consider the recommendations of the Attorney General and the Federal Trade Commission in establishing its rules.[19] The Act requires the Commission to make a jurisdictional market dominance determination within 90 days after the beginning of proceedings challenging the level of rail rates.[20] The Staggers Act, adopted in 1980,[21] adds a further limitation: the Commission shall find that the rail carrier establishing the challenged rate does not have market dominance unless the rate exceeds a stated revenue/variable cost ratio.[22]

### III.

Soon after passage of the 4R Act, the Commission adopted Ex Parte No. 320, introducing rebuttable presumptions of market dominance. The Commission presumed that a carrier had market dominance if (1) the carrier handled 70 percent or more of the traffic of goods involved within the prior year (the "market share" presumption); (2) the rail rate yielded revenues exceeding 160 percent of the railroad's variable cost of service (the "cost" presumption); or (3) the shipper had made a substantial investment in rail-related plant or equipment precluding the use of alternative transportation (the "substantial investment" presumption).[23] The "cost" and "substantial investment" presumptions were rebuttable through the introduction of any relevant evidence. The "market share" presumption could be rebutted only by evidence of direct carrier competition for the specific movement.

The Department of Justice, the Department of Transportation, and the railroads had urged that the definition of the relevant market should not be so confined but should extend more broadly to include product, geographic, and potential competition.[24] The Commission gave two reasons for rejecting that position. Such evidence would create complex antitrust-type litigation that could not be resolved within the 90-day statutory time limits[25] for making market dominance decisions. In addition, the Commission concluded that the statutory definition of market dominance precluded consideration of such competition.[26] The Commission also pointed out that, as experience was gained in the implementation of the concept of market dominance, refinements and modifications might be required. It would hold the proceedings open to permit reevaluation of the various standards and procedures, based on actual experience.[27]

The Commission's regulations were upheld on judicial review, with the exception of a limited remand for purposes of clarifying the cost presumption. *Atchison, T. & S.F. Ry. v. ICC,* 580 F.2d 623 (D.C.Cir.1978). In that case, as here, a major issue before the Court concerned the Commission's treatment of geographic and product competition. The Department of Justice argued that the Commission erred in not permitting such evidence to be considered even to rebut the regulatory presumptions. In upholding the Commission's decision to exclude such evidence, the court found "sufficient basis in the statutory language and purpose to merit our deferral to the Commission's view."[28]

Commenting generally on the respective role of the Commission and the courts in implementing the market dominance regulations, the District of Columbia court stated:

**19.** *Id.*

**20.** 49 U.S.C.A. § 10709(b) (West Special Pamphlet 1982).

**21.** Pub.L. No. 96–448, 94 Stat. 1895 (1980).

**22.** 49 U.S.C.A. § 10709(d)(2) (West Special Pamphlet 1982).

**23.** Ex Parte No. 320, Special Proc. for Findings of Market Dominance, 353 I.C.C. 874, *modified,* 355 I.C.C. 12 (1976).

**24.** 353 I.C.C. at 900.

**25.** *Id.* at 905.

**26.** *Id.* at 904–05.

**27.** 355 I.C.C. at 20.

**28.** 580 F.2d at 634.

Overall, the Court's role is one of deference and deferral. The Commission will be in a position to evaluate the regulations more fully in light of experience. That is an important feature of the administrative process. The courts remain open if the Commission is slothful or unwilling to undertake appropriate reconsideration and fine tuning in the light of experience.

580 F.2d at 623 (citations omitted).

In response to the court's remand for clarification of the cost presumption, the Commission issued a supplementary opinion.[29] In that opinion, the Commission noted that it was undertaking a further analysis of its market dominance definition that would, for example, "reveal how to treat evidence of geographic competition."[30] The Commission emphasized that it would look at all pertinent evidence and noted that, although certain kinds of competition are not relevant to computing market share, carriers could introduce evidence of geographic and product, as well as other, competition, to establish that effective competition exists.[31]

### Ex Parte 320 (Sub-No. 1)

After several years of experience with the presumptions,[32] and after completion of several studies,[33] the Commission proposed in Ex Parte No. 320 (Sub-No. 1)[34] removal of all but the cost presumption. In lieu of the eliminated presumptions, the Commission proposed that parties present any relevant evidence, including evidence of geo-

**29.** Ex Parte No. 320, Special Proc. for Findings of Market Dominance, 359 I.C.C. 735 (1979).

**30.** *Id.* at 735, n. 2 and accompanying text.

**31.** *Id.* at 736, n. 7 and accompanying text.

**32.** Following the promulgation of Ex Parte No. 320, the ICC began to apply its market dominance rules in maximum rate reasonableness cases. The practical effect of the application of these standards, according to the ICC, was a substantial lessening in the number of rates over which the Commission exercised its regulatory jurisdiction. *See Implementation of the 4–R Act, Hearing Before the Sub-comm. on Surface Transp. of the Committee on Commerce, Science and Transp. of the United States Senate,* S.Rep. No. 5, 96th Cong. 1st Sess. 46 (1979) (Statement of Hon. A. Daniel O'Neal). Chairman O'Neal noted that "between October, 1978 [the effective date of the market dominance rules] and December, 1978, the Commission precluded only 15 rate increases from taking effect out of several thousand filed and 267 protested [under what is now 49 U.S.C. § 10707]." *Id.* He went on:

> This is in significant contrast to the period just before the enactment of the 4–R Act, when investigations and suspensions of rail rates ran at much higher levels. For example, in the first months of 1975, we suspended 75 rate schedules out of 170 protested. And if you translate that to a 2-year period, that would be 300 suspensions as opposed to 15 in the 2-year period after the act became effective.

> Quite clearly, the market dominance concept [combined with procedural standards set forth in Section 202 of the 4R Act] have had a very great effect on rate and ratemaking where traffic is competitive.

*Id.* at 58.

In 1979, A. Daniel O'Neal, then the I.C.C.'s Chairman, reported to Congress, "We believe our market dominance regulations are an accurate implementation of the policies embodied in the 4–R Act." *Id.* at 58. The Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce issued a report praising the Commission's implementation of the market dominance regulations. *See* Committee Print 96–I.F.C. 40 (February, 1980).

**33.** In a report to Congress (ICC, *The Impact of the 4R Act Railroad Ratemaking Provisions,* October 5, 1977), the Commission analyzed, among other things, the impact of its market dominance regulations. That report concluded that approximately 50 percent of rail traffic would be market-dominant under the Commission's presumptions, absent rebuttal evidence. *Report* at 51. Subsequently, the Commission staff directed a research project by a consultant to analyze the market dominance concept in operation. In a report issued in 1979, the consultants concluded, *inter alia,* that (1) because of the complexity of rail markets, general procedural rules must permit exceptions in individual circumstances; (2) very little rail traffic (under 5% long term, 10–15% short term) is market dominant if all transportation alternatives are considered; and (3) rebuttable presumption tests tend to be inaccurate. A.T. Kearney Inc., *A Study to Perform an In-Depth Analysis of Market Dominance And its Relationship to Other Provisions of the 4R Act,* IX–4–6 (1979).

**34.** *Rail Market Dominance and Related Considerations,* 45 Fed.Reg. 3353 (Proposed January 17, 1980).

graphic or product competition. While the Commission was considering comments in that proceeding, however, Congress enacted new legislation which required modification of that proposal.

*The Staggers Act Amendment*

In 1980, Congress amended the market dominance section by restricting the situations in which the Commission might find market dominance. Section 202 of the Staggers Act directs the Commission to make a finding that the carrier lacks market dominance if the carrier shows that the challenged rate would yield revenues less than a given percent of variable cost.[35] Contrary to the Commission's previous cost presumption, the amended statute provides that a finding that a rate is equal to or greater than the statutory variable cost percentage "does not establish a presumption" of market dominance.

*The Challenged Decision:*

1. *Elimination of the Market Dominance Presumptions*

Following passage of the Staggers Act, the Commission adopted the challenged regulations. The market dominance presumptions have been eliminated and replaced with broader and more flexible guidelines. The primary reason for adopting the new approach is the Commission's conclusion

that the presumptions do not necessarily reflect railroad market power and, therefore, yield inaccurate market dominance determinations.[36] The cost, market share, and substantial investment presumptions are found to be poor indicators of market dominance in the widely varying fact situations to which they must be applied. The new guidelines focus market dominance evidence on the transportation alternatives, if any, available to a shipper, and the feasibility of using each.[37]

2. *Cost Presumption*

With respect specifically to elimination of the cost presumption, the Commission notes that the former presumption (*i.e.,* a rate exceeding 160 percent of variable cost establishes market dominance) is inconsistent with the Staggers Act.[38] That act removes from Commission jurisdiction rates below a threshold figure set at 160 percent for 1980 and increasing annually to 180 percent in 1984. The Commission rejects suggestions that it adopt a higher ratio as a presumption of market dominance, noting that although price/cost ratios provide a convenient benchmark for deciding whether to look for market dominance (the role assigned by the jurisdictional provision of the Staggers Act), there are a number of reasons why a high price/cost ratio may not be indicative of true market power.

---

**35.** 49 U.S.C.A. 10709(d)(2) (West Special Pamphlet 1982). The revenue/variable cost percentage threshold started at 160 percent in 1980 and increases each year, in five percent increments, to 180 percent in 1984.

**36.** Ex Parte No. 320 (Sub-No. 2), Market Dominance Determinations, 365 I.C.C. 118, 120–21 (1981).

**37.** *Id.* at 131.

**38.** That act provides:
In making a determination under this section, the Commission shall find that the rail carrier establishing the challenged rate does not have market dominance over the transportation to which the rate applies if such rail carrier proves that the rate charged results in a revenue-variable cost percentage for such transportation that is less than—
(A) 160 percent during the period beginning on the effective date of the Staggers

Rail Act of 1980 and ending September 30, 1981;
(B) 165 percent during the period beginning October 1, 1981, and ending September 30, 1982;
(C) 170 percent during the period beginning October 1, 1982, and ending September 30, 1983;
(D) 175 percent or the cost recovery percentage, whichever is less, during the period beginning October 1, 1983, and ending September 30, 1984; and
(E) the cost recovery percentage, during each 12-month period beginning on October 1, 1984.
For purposes of subparagraphs (D) and (E) of this paragraph, the cost recovery percentage shall in no event be less than a revenue-variable cost percentage of 170 percent or more than a revenue-variable cost percentage of 180 percent.
49 U.S.C.A. § 10709(d)(2) (West Special Pamphlet 1982).

Ratios do not, for instance, tell us about the degree of market power possessed by the railroad, since they do not tell us whether a proposed rate will actually move traffic over an extended period of time. If the rate is high, shippers may find alternatives more attractive, forcing the rate back down again. Some may accept the high rate because of a preference for the carrier or because of a premium service associated with it. There are any number of reasons why a high price/cost ratio may not be indicative of true market power on the part of the railroad. Reliance on such ratios will, therefore, not only be misleading, but will preclude more relevant information from being introduced.[39]

As an additional reason for eliminating the presumption, the Commission recites the difficulties in determining the variable costs of a rail movement.

Such costs depend on numerous factors that vary considerably from one movement to another. Since the simplicity of the cost test requires that a standard costing methodology be used, there is no way of avoiding the distorting inaccuracies of such a test. Many rates falling above a designated revenue-to-variable cost ratio would, on the basis of more accurate cost estimates, in fact be below it. Since more accurate cost information can, and very likely will, be presented as evidence, we think a price/cost presumption based on imperfect, though standard, cost estimates offers very little help.[40]

### 3. Market Share Presumption

The Commission's reason for eliminating the market share presumption is the diffi-culty it has found in defining the scope of the market.[41] The basic problem, the Commission points out, is that the factors determining the appropriate scope vary widely in individual situations. Moreover, the Commission asserts that even an accurate calculation of a carrier's share of a particular market reflects only the transportation alternatives selected in the past, as opposed to alternative sources currently available. The competitive implications of any given market share percentage, therefore, vary widely from case to case.

### 4. Substantial Investment Presumption

The Commission states that the substantial investment presumption was designed to protect shippers tied to a particular carrier by substantial rail-related investment.[42] Its decision to eliminate the presumption is based on two considerations. First, the Commission has experienced difficulty in identifying pertinent elements of a shipper's investment in plant and equipment and in determining whether that investment makes use of another carrier or method impossible or impractical. Explaining its decision to eliminate the presumption, the Commission asserts that the "amount of rail-related investment is, by itself, a poor index of captivity."[43] As an example, it cites the purchase of coal cars, which may represent a new and substantial rail-related investment, yet not tie shippers to a particular railroad.

Second, the ability of shippers and carriers to enter into rail service contracts has reduced the importance of substantial investment in market dominance proceedings.[44] Shippers can now protect them-

**39.** 365 I.C.C. at 122.

**40.** Id.

**41.** Id. at 123.

**42.** Id. at 124.

**43.** Id.

**44.** The Commission first liberalized contracting opportunities on its own initiative through the issuance of three notices in Ex Parte No. 358, Railroad Contract Rates, in 1978, 1979, and 1980. Ex Parte No. 358, Railroad Contract Rates, 45 Fed.Reg. 58189 (1978) (codified at 49 C.F.R. Part 1039); Ex Parte No. 358–F, Railroad Contract Rates, 45 Fed.Reg. 21719 (1980) (codified at 49 C.F.R. Part 1039). The policy announced in those proceedings was codified and clarified in Section 208 of the Staggers Act, 49 U.S.C. § 10713 (West Special Pamphlet 1982). Section 208(a) of the Staggers Act (49 U.S.C. § 10713) permits railroads and shippers to contract for rail transportation services. Contracts entered into under that section are exempt from all ICC regulation and the exclu-

selves, the Commission states, by negotiating with various carriers. When sufficient competition exists, carriers will have the incentive to offer contracts with reasonable terms.[45]

The Commission adopts substantially the same policy with respect to long-term coal supply contracts, in which shippers tie themselves to particular carriers by negotiating long-term contracts with coal sources served by only one railroad.[46] The Commission has decided to place considerably less weight on the existence of long-term coal supply contracts executed after passage of the Staggers Act. It is concerned that shippers will not take advantage of opportunities to negotiate with carriers, but will rely instead on the old presumptions. In effect, the Commission has announced that it will not allow shippers to ensure its continuing jurisdiction over their rail transportation after October 1980 by tying themselves to a single carrier with substantial rail-related investments or long-term supply contracts.

### 5. *Geographic and Product Competition*

The Commission's guidelines state that four major forms of competition affect rail transportation: (1) intramodal competition, *i.e.,* competition by railroads with railroads; (2) intermodal competition, *i.e.,* competition with railroads by other forms of transportation; (3) geographic competition; and (4) product competition.[47] Under each of these headings, the guidelines list representative factors relevant to the existence of competition.[48] The guidelines indicate that other forms of competition may also be important in individual circumstances and that the Commission is prepared to consider such evidence on a case-by-case basis.[49]

Because of its prior position on the limited applicability of evidence concerning geographic and product competition, the Commission discusses at length its decision to include such evidence.[50] First, the Commission addresses its original interpretation of the statutory language and concludes that its reading was unnecessarily restrictive in focusing only on direct carrier competition and ignoring the indirect competitive impact that geographic or product competition may have.[51] The Commission finds nothing in the 4R Act or the Staggers Act that precludes revising its original restrictive interpretation.[52]

In response to arguments that consideration of geographic and product competition is not possible within the time allotted, the Commission states that determining the presence or absence of effective geographic competition under the new guidelines should be manageable in most cases. Finally, the Commission addresses its previous concern that such evidence can not establish the existence of truly effective competition because geographic or product competition does not provide an immediate restraint on prices.[53] Although those forms of competition are less effective in restraining prices than a possible immediate loss of traffic, the Commission now recognizes the deterrent effect of a future loss of revenues on short-term market abuse.

In order to clarify the procedures for introducing evidence of market dominance, the Commission first notes that the railroad has the statutory obligation to present revenue/variable cost evidence if it seeks to

---

sive remedy for breach, as with any contract, is a court action. 49 U.S.C. 10713(i) (West Special Pamphlet 1982).

**45.** *Id.* at 125.

**46.** *Id.* at 126.

**47.** *Id.* at 131.

**48.** *Id.* at 132–34.

**49.** *Id.* at 131.

**50.** *Id.* at 127–31.

**51.** *Id.* at 128.

**52.** The Commission also found evidence that the Staggers Act suggested a more flexible interpretation. *Id.* at 129. This basis for change is now abandoned. Counsel for the Commission concedes that the Staggers Act contains nothing to support the change, while opposing any suggestion that it implies approval of the Commission's former interpretation.

**53.** *Id.* at 131.

demonstrate that the rate is below the statutory jurisdictional threshold. The railroad must also introduce evidence of product or geographic competition by identifying such competition. Once the railroad has made this identification, the party opposing the rate has the burden of proving that the product or geographic competition identified by the railroad is not effective.

Thus, the Commission's new guidelines reflect, in part, the positions urged originally by the agencies with statutory responsibility for advising it. After five years of experience with a more cautious approach, the Commission has found merit in the FTC's original criticism that use of presumptions as "shortcuts" obscures other considerations of relevance to the market dominance determination.[54]

## IV.

■ The petitioners challenge the Commission's position that the statute gives it authority either to consider or not to consider evidence of geographic and product competition in determining market dominance. To evaluate this position, we first return to the statute. It refers to "effective competition . . . *for* the transportation to which a rate applies," [55] not to competition *with* that transportation.

The statutory language must be read in the light of the manner in which the market dominance issue arises. When a shipper challenges a specific rate to transport a particular product from one place to another, the Commission has jurisdiction to review the reasonableness of the rate only because the rail carrier setting the rate has market dominance over that particular movement. Competition *for* a movement of coal by rail from a coal deposit in Wyoming to a utility company in Texas, for example, is created only if some other carrier is willing to move that product from the same origin to the same destination. The availability of coal moving by barge from a mine in Kentucky to the Texas utility (geographic competition) creates competition *with* the Wyoming-Texas movement but not competition *for* that movement. Similarly, suppliers of natural gas seeking to deliver it by pipeline to the utility may compete economically with the sellers of coal to supply an alternate energy source, but neither the natural gas producers nor the pipeline delivering their product compete *for the movement* to which the challenged rate applies.

The congressional history does not indicate that the Commission was meant to consider geographic and product competition in determining whether a carrier has market dominance. The Senate Conference Report on the 4R Act merely states:

> While the absence of effective competition test is not intended to strictly conform with the standards of the antitrust laws, it is intended that when the Commission administers the test *it will recognize the absence of forces which normally govern competitive markets.*" (Emphasis added.)

1976 U.S.Code Cong. & Ad. News 148, 163. Far from requiring the Commission to recognize the presence of product-geographic competition, this language mandates only that the Commission recognize the absence of competitive forces in the railroad industry.

The Staggers Act demonstrates that Congress knew the economic significance of product-geographic competition and referred specifically to those factors when it thought them appropriate. Section 205(a)(1) of the act requires the Commission to initiate a proceeding to determine whether, and to what extent, "product competition" (defined by the statute to include both what we have called product and geographic competition) should be considered in determining the reasonableness of rates. The instruction is not set forth in the U.S.Code

**54.** *See* discussion in *Santa Fe, supra,* 580 F.2d at 630–31.

The Department of Justice had, however, suggested only the consideration of such evidence in rebuttal. *Id.,* at 633.

**55.** 49 U.S.C.A. § 10709(a) (West Special Pamphlet 1982).

but is contained in the historical note following 49 U.S.C.A. § 10701a (West Special Pamphlet 1982). Section 205(a) expressly recites that this shall not be construed as altering the meaning of the term "market dominance" as defined in 49 U.S.C. § 10709(a). Pub.L. No. 96–448, § 205(a)(3)(B), 94 Stat. 1905 (1980).[56]

The Commission's interpretation of the statute would read "effective competition ... *for* the transportation to which a rate applies" to mean "effective competition *with* the transportation." There may be sound economic or administrative arguments for giving the Commission such free rein, but Congress simply did not do so. The Commission's studies showing that direct competition for a particular movement is not a sufficient economic test may indicate how much wiser Congress would have been had it allowed the Commission more latitude. Those studies and the Commission's recommendations may, indeed, persuade Congress to alter the statute. But the post-enactment economic studies tell us nothing about what the statute means.

While the Commission's original interpretation of the statute as excluding consideration of product-geographic competition is not decisive, it is not to be ignored. In deferring to the Commission's original interpretation, the District of Columbia Circuit commented "the construction may appear to some to attribute excessive significance to a terse statutory term." *Santa Fe, supra,* 580 F.2d at 634. The tentativeness of this endorsement does not constitute approval of a completely different reading. The statute is certainly brief: the entire definition of market dominance is set forth in twenty words. But brevity does not necessarily imply ambiguity. When a stat-

ute is clear, we should read it to mean what it says, however succinctly.[57]

We do not imply that, once the Commission makes a statutory interpretation, it is bound by a sort of agency stare decisis. Based on what the Commission learns from experience, new information, or new ideas, it may indeed alter its interpretations, overturn its administrative rulings, and adopt new practices. *American Trucking Associations, Inc. v. Atchison T. & S.F. Ry. Co.,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847, 860 (1967). Error is not to be perpetuated simply because it has been once made, and wisdom is not to be rejected merely because it comes late.

Here, however, there is no evidence the Commission has learned one iota more about the meaning of the statute or the direction of Congress than it knew five years ago. The Commission has merely altered its reading of what Congress directed a half-decade earlier because it considers that the new interpretation would produce more desirable results. This after-acquired wisdom cannot alter the statutory language and allow the Commission unfettered authority to define effective competition as it will.

## V.

The petitioners also contend that the Commission's guidelines contravene the congressional directive in the 4R Act, that it

establish, by rule, standards and procedures for determining ... whether and when a carrier possesses market dominance .... Such rules shall be designed

**56.** On May 14, 1981, the Commission issued a decision concluding that such competition would not be considered as a reasonableness issue. Ex Parte No. 320 (Sub-No. 2), Market Dominance Determinations, 365 I.C.C. 1 (1981), *petition for review filed sub nom. Association of American Railroads v. United States,* No. 81–2249 (D.C.Cir. filed Nov. 30, 1981), *transferred,* No. 82–4082 (5th Cir. Feb. 26, 1982), *consolidated with* No. 81–4257, *motion to sever granted* June 17, 1982.

**57.** *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748, 755 (1982); *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246, 252 (1981); *Howe v. Smith,* 452 U.S. 473, 483, 101 S.Ct. 2468, 2475, 69 L.Ed.2d 171, 180 (1981).

to provide a practical determination without administrative delay.[58]

Necessarily our determination will require the Commission to reconsider its standards and procedures. However, because some of the questions raised and fully briefed in this appeal must be considered by the Commission and may, therefore, recur, we now consider them.

■ The Commission, it is argued, has promulgated "guidelines" rather than "rules," and these do not establish standards or procedures that will permit a practical determination. It is of no moment that, for reasons it has failed to articulate, the Commission has clad its promulgation in the cloak of guidelines rather than rules. The Administrative Procedure Act[59] defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." The Commission followed the notice and comment procedures for rulemaking prescribed by the Administrative Procedure Act. 5 U.S.C. § 553 (1976). None of the petitioners challenges the fairness of the procedure or the Commission's compliance with the rulemaking procedures. Although the Commission's decision embodies statements of policy and interpretations, the Commission also clearly intended to announce a change in the method it would follow in making the market dominance determination, a determination affecting substantive rights.[60]

In *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452 (5th Cir.1981), we discussed the differences between guidelines and rules and the criteria to be applied in determining whether, in a given situation, the distinction is merely semantic. As we there held, the status of guidelines as "rules" is determined by their binding character.[61] The Commission's guidelines describe the "obligations" of railroads and shippers (365 I.C.C. 131–32); direct shippers to "use these guidelines for preparation of rebuttal evidence" (*id.* at 132); and state that the Commission "will" give more or less weight to certain evidence (*id.* at 131) and "will" consider product and geographic competition evidence (*id.* at 135). In short, as in *American Trucking*, there are "sinews of command beneath the velvet words of the . . . guidelines." 659 F.2d at 463.[62] The guidelines here involved are indeed rules by these criteria and the Commission's choice of nomenclature is without legal significance. Thus, the Commission's guidelines conform to the 4R Act's "rule" requirement.

■ Whether or not the Commission can feasibly make market dominance determinations within ninety days based on its guidelines is a matter for it to determine, at least in the first instance. Whatever the complexity of the issues before it in determining market dominance, the Commission is the best arbiter of its ability adequately to consider those factors within the time allowed. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 524–25, 98 S.Ct. 1197,

---

**58.** This language was repealed as executed in 1978. *See supra* note 18.

**59.** 5 U.S.C. § 551(4) (1976).

**60.** *Cf. American Bus Ass'n v. United States*, 627 F.2d 525 (D.C.Cir.1980).

**61.** 659 F.2d at 463. The fact that the Commission used the term "guidelines" is not controlling: it is the impact and not the phrasing that matters. Indeed, agencies often adopt policies having the status of rules without codifying them in regulations, guidelines or in other formal formats. *See Brown Exp., Inc. v. United States*, 607 F.2d 695 (5th Cir.1979).

**62.** The *American Trucking* test primarily identifies "rules" by whether the agency *intends* them to control the course of its future proceedings. The language just quoted shows that the ICC did so intend. For example, the Commission could not refuse to consider product competition where proved, nor could it direct that the shipper bear the burden of proof to show that railroad rates were above the variable cost threshold in a particular case without repealing its guidelines through rulemaking procedures. *See* 365 I.C.C. at 131–132.

1202, 55 L.Ed.2d 460, 467–68 (1978). We decline to tell the Commission in advance of any experience that its procedures prevent it from reaching a decision within the time allowed it by statute.

Petitioners also attack the sufficiency of the guidelines to constitute "standards," as Congress commanded. They argue that the guidelines lack the definiteness and predictability of standards and, therefore, do not allow the Commission and parties to measure in a practical way whether there is effective competition in a particular situation. Because our decision requires the Commission to develop new rules that may be more or less explicit than the present ones, we need not now decide how precise administrative declarations of policy must be to constitute standards. For the same reasons, we decline to rule on the argument that the guidelines do not lend themselves to the "practical determination" of market dominance exacted by Congress.

## VI.

■ In addition to its decisions concerning product-geographic competition, the Commission's guidelines eliminate the presumption of market dominance flowing from substantial shipper investment in rail-related plant or equipment. Instead, the 1980 guidelines announce that evidence of substantial investment made prior to October 1, 1980 (the date of passage of the Staggers Act) can be introduced as "an evidentiary tool." [63] Investments made after that date will not be considered. The petitioners contend that this arbitrarily excludes evidence of post-October 1, 1980 investments, and is unreasonable even as to investments made before that date.

As to pre-October 1, 1980 investments, the Commission has merely removed the presumption, rebuttable even in its original formulation, that a carrier has market dominance when affected shippers or consignees "have made a substantial investment in rail-related equipment which prevents or

makes impractical the use of another carrier or mode." [64] The Commission's reasons for doing so have already been noted. As to post-October 1, 1980, investments, the Commission reasons that "contracts afford adequate protection to shippers with substantial rail-related investment." [65] The Commission also deals with the argument "that such contracts encompass too short a period of time to cover the life of most rail-related investments."

For example, the Chemical Manufacturers Association indicated that, because of many uncertainties, railroads are generally reluctant to engage in long-term contracts and that few of these contracts exceed 5 years. We do not deny that the protection afforded by a contract becomes less effective to the extent that the life of that contract is less than the life of the rail-related investment. However, we also emphasize that such problems are not beyond the control of the shipper. A long-term contract that protects the shipper for the life of the investment should be available from a railroad who is encouraging that investment to be made, given the business that it means for the railroad. Furthermore, the historical failure of shippers to negotiate long-term contracts may, in part, have been due to the protection provided by the substantial investment presumption. 365 I.C.C. at 125.

Contrary to petitioners' assertion, the Commission is not forcing shippers who make substantial investments in rail-related equipment after the Staggers Act either to enter into a rail transportation contract or to forego maximum rate protection under the Interstate Commerce Act. Its decision encourages shippers to use whatever bargaining position they have to negotiate with carriers for transportation before making substantial investments. The Commission has professed a readiness to recognize the absence of transportation alternatives in particular situations and to afford

**63.** 365 I.C.C. at 124.

**64.** 365 I.C.C. at 123.

**65.** *Id.* at 124.

those shippers adequate protection. This policy does not, on the face of it, seem arbitrary in an era where railroads and shippers are free to contract under the Interstate Commerce Act. To the extent that the Commission's guidelines encourage shippers with transportation alternatives to negotiate for transportation contracts, the guidelines are consistent with Congressional policy.[66]

■ Ultimate correctness, like truth, is difficult to ascertain. The Commission's reasons are plausible. Petitioners seek to demonstrate the untenability of the Commission's decision by argument rather than evidence. It is not our role to reassess the decision *de novo,* but only to reject it if it is arbitrary or capricious. Nothing in the record and nothing of which we might take judicial notice enables us to stigmatize that decision as willfully adopted, without support or reasonable explanation.

## VII.

Finally, the petitioners protest elimination of the cost and market share presumptions of market dominance. Although the guidelines eliminate the presumptions, they do not arbitrarily exclude pertinent evidence. The Commission encourages the submission of evidence of "more accurate costing information which may include price-cost ratios and lead to more appropriate market determinations."[67] It also promises to consider evidence of current market shares and market share trends. The Commission's half-decade of experience with the presumptions equips it to decide whether the presumptions have accomplished their purpose. We lack the knowledge to evaluate the Commission's conclusions and the warrant to substitute our judgment. Certainly we cannot brand the conclusions arbitrary or capricious.

---

**66.** *See* H.Rep. No. 1430, 96th Cong., 2d Sess. 100, U.S.Code Cong. & Admin.News 1980, 3978, 4132 (1980) ("[T]he conferees intend to encourage shippers to contract....")

## CONCLUSION

■ For these reasons, we hold that the Commission's rule allowing evidence of product and geographic competition to be considered in deciding whether a carrier has market dominance violates the limits contained in the statutory definition and is invalid. We express no opinion whether its "guidelines" are sufficient to be "standards" because they must be recast after new rules concerning market dominance are framed. We uphold the Commission's rules eliminating cost, market share, and substantial investment presumptions.

The petitioners invite us to provide interim rules for the Commission by reinstating its former guidelines. This we decline to do. The Commission itself is best equipped to decide how it will formulate regulations consistent with this opinion and what procedures it will adopt to handle its task in the interim.

The case is REMANDED for further proceedings consistent with this opinion.

JOHN R. BROWN, Circuit Judge, dissenting:

I dissent as to the Court's holding "that the Commission's rule allowing evidence of product and geographic competition in deciding whether a carrier has market dominance violates the limits contained in the statutory definition and is invalid," and to the reasons assigned to that result.[1]

The Railroad Revitalization and Regulatory Reform Act of 1976 ("4R Act") constitutes a dramatic shift in government control of our nation's railroads, a shift "from reliance on government control to serve the public interest to reliance on market forces." Morton, *Contract Rates by Rail—A Tool in Ratemaking,* 49 I.C.C. Practitioners' Journal 413, 414 (1982). The 4R Act, as relevant here, restricted the I.C.C.'s jurisdiction over railroad rates to situations of "market dominance", but it left in the

---

**67.** 365 I.C.C. at 122.

**1.** I concur in all other holdings and the opinion's careful, exhaustive treatment of the background and development of the problem.

agency's lap the determination of appropriate standards and procedures relating to market dominance. The Commission, in Ex Parte No. 320, *Special Procedures for Making Findings of Market Dominance,* 353 I.C.C. 873, *modified,* 355 I.C.C. 12 (1976), adopted regulations to that end. It excluded geographic and product competition from the list of factors it would consider in making that jurisdictional determination.

In the Staggers Rail Act of 1980, Congress reiterated its intent that the I.C.C. deregulate. Taking the hint, the I.C.C. abandoned market dominance presumptions and replaced them with broader, flexible guidelines. Reversing its prior position, it approved the consideration of geographic and product competition as factors indirectly relevant to determining competitive effect. The I.C.C., relying upon five years' experience with the original regulations, explained that its position had been too restrictive. Neither the 4R Act nor the Staggers Act, the I.C.C. stated, prevented such action.[2]

Any agency's freedom to change its mind, while neither guaranteed by the Constitution nor sanctioned by the Administrative Procedure Act, seems nonetheless a fundamental tenet in the effective and efficient administration of government. As times and business change, an agency may conclude that its policies should change as well.

**2.** I do not question the Court's note 52 and related text.

**3.** Congressional concern over the effectiveness of its actions and the response by the I.C.C. undoubtedly led to the hearing by the Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce. Petitioners' brief points out:

See, *Implementation of the 4–R Act, Hearing Before the Sub-comm. on Surface Transp. of the Committee on Commerce, Science and Transp. of the United States Senate,* S.Rep. No. 96–5, 96th Cong. 1st Sess. 46 (1979) (Statement of Hon. A. Daniel O'Neal). Chairman O'Neal noted that "between October, 1978 [the effective date of the market dominance rules] and December, 1978, the Commission precluded only 15 rate increases from taking effect out of several thousand filed and 267 protested [under what is now 49 U.S.C. § 10707]." (*id.*) He went on:

Prior policy, while not erroneous, simply no longer fits the bill. The Supreme Court has made that doubly clear as this Court recognized in *Aberdeen & Rockfish R. Co. v. United States,* 682 F.2d 1092 (5th Cir.1982):

[T]he Commission, faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice.... [T]his kind of flexibility and adaptability to changing needs and patterns of transportation is an essential part of the office of a regulatory agency. Regulatory agencies do not establish rules of conduct to last forever; they are supposed, within the limits of the law and of fair and prudent administration, to adapt their rules and practices to the Nation's needs in a volatile, changing economy. They are neither required nor supposed to regulate the present and the future within the inflexible limits of yesterday.

*American Trucking Associations, Inc. v. Atchison, Topeka & Santa Fe Railway,* 387 U.S. 397, 416, 87 S.Ct. 1608, 1618, 18 L.Ed.2d 847 (1967).

Indeed, as it must, the majority recognizes this. *Ante,* p. 391. The I.C.C., prodded[3] by Congress, made such a decision here. After a few years' experience in administering the 4R Act, it chose to amend

This is in significant contrast to the period just before the enactment of the 4–R Act, when investigations and suspensions of rail rates ran at much higher levels. For example, in the first months of 1975, we suspended 75 rate schedules out of 170 protested. And if you translate that to a 2-year period, that would be 300 suspensions as opposed to 15 in the 2-year period after the act became effective.

Quite clearly, the market dominance concept [combined with procedural standards set forth in 4–R Act § 202] have had a very great effect on rate and ratemaking where traffic is competitive. *Id.* at 58.

And the Subcommittee issued a report praising the Commission's implementations of the then market dominance regulations (*see,* Committee Print 96–I.F.C. 40 (February, 1980).)

However one slices it, the heat—Congressional heat, that is—was on.

its original stance on geographic and market dominance.

The case, as the Court puts it, comes down to the statutory terms limiting I.C.C. power to pass on rates to those in which the rail carrier has "market dominance *over the transportation to which* [the] *particular rate applies,* with "market dominance" being originally defined as "an absence of effective competition from other carriers or modes of transportation *for the traffic or movement to which a rate applies.*" [4]

With stark simplicity, in the Court's approach it is a prepositional controversy whether it is competition *for* the transportation or competition *with* that transportation.[5]

This, in the words of the D.C. Circuit in its obviously reluctant, deferential approval of the I.C.C.'s order for not having credited the criticism of the Department of Justice and the F.T.C., "may appear to some as an attempt to attribute excessive significance to a terse statutory term." *Atchison, Topeka & Santa Fe Rwy. Co. v. I.C.C.,* 580 F.2d 623, 634 (D.C.Cir.1978).

If the application of one, but not the other, of two simple words is the key to permissible response the Commission could make to relentless congressional pressure to successively relieve rail transportation from a half century of burdensome governmental control and leave it more and more to the regulatory competitive forces of the market place, it would certainly seem to me to be the situation in which considerable latitude had to be committed to the agency responsible for superintending the lessened regulation. This would include interpretation of the underlying statute. "The administrative interpretation of the Act by the enforcing agency is entitled to great deference." *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158, 165 (1971).

It bears repeating what the Supreme Court said:

> When faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings" . . . "Particularly is this respect due when the administrative practice at stake involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly when they are yet untried and new.

*Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625, (1965) (citations omitted).

The Court says little about the reasons, or more significantly, the reasons stated by the Commission in changing its views. The Commission, however, supplied a reasoned basis for its present holding that the statutory definition, properly construed, does not automatically preclude considering such evidence:

> We believe that [our prior] interpretation was unnecessarily restrictive. There is no evidence in the 4R Act that we consider only "direct" competition from other carriers or modes. Since the traffic to which the rate applies faces competition from other sources or destinations of the same product or from substitute products *the carriers transporting that traffic face "indirect" competition from other carriers* . . . . . "[E]ffective competition from other carriers or modes of transportation,

---

4. Pub.L. No. 94–210, § 202(b), 90 Stat. 31 (1976), codified at 49 U.S.C. § 1(5)(c) (1976) (emphasis added).

  That language was subsequently revised, without substantive change, when the Interstate Commerce Act was recodified in 1978, Pub.L. No. 95–473, 92 Stat. 1337 (1978). The revised definition, as currently set forth in 49 U.S.C. 10709(a) refers to "*transportation to which the rate applies*" in lieu of "*traffic or movement to which the rate applies.*"

5. *See* Court's opinion at note 55 and related text. Ante at 390.

for the traffic to which the rate applies" means that, if a carrier raises the rate for such traffic, then some or all of that traffic will be lost to other carriers or modes.

(emphasis added)

In disposing essentially of the "for" or "with" contention and in responding to contentions that consideration of product and geographic competition would not be attainable within the short time allotted, the Commission stated that with the new guidelines, determining the presence or absence of effective competition would be manageable. The I.C.C. described its conclusions and methods:

> In general, geographic or product competition will be deemed to be present if it is established that alternative supplies of the same or a close substitute product exist and that carriers transporting these same or close substitute commodities from the various sources to the various destinations compete with one another for the traffic in question. Whether such competition is judged to be effective will depend on evidence concerning the substitutability of one supply source or destination for another or one product for another. If, in a particular case, the Commission finds that the evidence submitted is inconclusive, then such evidence will be given minimal weight in our determination of market dominance. We believe that this is an improvement over our 1976 position that evidence of geographic and product competition be always and automatically excluded from every proceeding.
>
> We believe that this is an improvement over our 1976 position that evidence of geographic and product competition be

**6.** The petitioner's brief advises us:

> For example, in 1979, some two and a half years after its original decision in Ex Parte No. 320, the Commission stated in a footnote to a subsequent decision in the same proceeding that evidence of geographic and product competition should be admitted in market dominance proceedings. Ex Parte No. 320, 359 I.C.C. 735, 736 n. 7 (1979). This decision was issued in response to a remand from the D.C. Circuit seeking clarification on one aspect of the original decision. The footnote was unrelated to the purpose of the remand. The Commission also discussed geographic competition as being relevant to market dominance in two coal rate cases. In each of these cases the Commission found market dominance to exist, so no challenge was ever raised to its dicta concerning geographic competition. See Docket No. 37246,

always and automatically excluded from every proceeding.
365 I.C.C. 130.

Both from the standpoint of Congressional awareness and revelations of the thinking of the I.C.C. the order under attack did not come as a bolt out of the blue. After Ex Parte No. 320, references began to appear in several Commission decisions indicating that product and geographic competition were relevant to the inquiry on market dominance.[6]

And even more to the point was the Commission's decision on remand from the D.C. Circuit's decision in *Santa Fe:*

> We will look at all pertinent evidence in arriving at a decision; see 353 I.C.C. 874 at 928.[*]

---

[*] There has been some misunderstanding on this point. While certain evidence is not germane to computing market share, proponents of a rate *may introduce evidence* of potential competition from private carriage, *alternative product competition or geographic competition* to show that effective competition exists.

Ex Parte No. 320, *supra,* 359 I.C.C. at 736.

Whatever influence these expressions might have had on the Congress the most reasonable interpretation of the legislative history of the Staggers Act is that Congress was aware that the Commission was itself reexamining the geographic and product competition issue and determined not to decide the issue legislatively, but to leave the matter to the Commission. That interpretation is supported by the Conference Commission Report:

> [S]ince other parts of the Conference substitute provide additional rate freedom for rail carriers beyond those found in

*Increased Rates on Coal, Midwestern Railroads, August, 1979,* (November 15, 1979) (unprinted); I. & S. No. 9199, *Unit Train Rates on Coal—Burlington Northern, Inc.* 361 I.C.C. 651 (1979), remanded on other issues, *Iowa Public Service Co. v. Interstate Commerce Commission,* 643 F.2d 542 (8th Cir.1981).

Also in Docket No. 37226, *Incentive Rates on Coal-Axial, Co. to Coleto Creek, Tx.* (January 15, 1980) ("Coleto Creek"), the Commission actually relied on evidence of geographic competition to make a finding of no market dominance. That decision was reversed and remanded by this Court in *Central Power & Light Co. v. United States,* 634 F.2d 137 (1980), *supplemented on rehearing,* 639 F.2d 1104 (1981), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 108 (1982).

present law or under existing or proposed Commission regulations, the Commission must revise its market dominance regulations. In maintaining the term market dominance, in addition to statutory changes designed to provide more rate freedom to rail carriers, the conferees intend that *whenever there is effective competition,* such competition should continue to function as the regulator of the rate rather than the Commission. Maintenance of the "market dominance" standard is *not intended in any way to restrict the ability of the Commission to apply this concept,* both in its regulations and individual cases.

H.Rep. No. 96–1430, 96th Cong.2d. Sess. 88–89 (1980), U.S.Code Cong. & Admin. News 1980, 4120 (emphasis added).

Finally, rescuing the Court's example (notes 55–56 and related text Ante 390–391) from the strictures of *"for"* and *"with"*, the idea of geographic competition makes economic sense to this untutored, and if so, the Commission with its half century experience could concur. For example, a Chicago coal purchaser might have two alternate sources of supply: Southern Illinois and Wyoming coal being a fungible commodity the Chicago purchaser has no preference between the two. The Wyoming producer must compete with the Illinois rival, and transportation costs figure in his calculations. The carrier, if it hopes to secure the Wyoming business, must and will take the alternative into account—a pure case of geographic competition within a market.

The Court, embracing all of the standards by which all are bound on the scope of judicial review, nevertheless reaches a conclusion which trespasses on the domain reserved ·to the I.C.C. The result overrides the considerable deference due the Commission in its interpretation of the statute in the light of its experience and the meaning of the terms in the practical complex world of transportation.

There are areas "where angels fear to tread". This is one for judges.

## ON PETITIONS FOR REHEARING AND SUGGESTIONS FOR REHEARING EN BANC

Before CLARK, Chief Judge, BROWN, GEE, RUBIN, REAVLEY, POLITZ, TATE, JOHNSON, WILLIAMS, JOLLY and HIGGINBOTHAM, Circuit Judges.

BY THE COURT:

A member of the court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that these causes shall be reheard by the court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.